UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x

HOLLY MARIE HUMMEL, on behalf of     )
herself and others similarly situated,     )
    )
          Plaintiff,     )
    )
          -against-     )
    )
ASTRAZENECA LP,     )
    )
          Defendant.     )
    )

     No. 07-civ-5473

     MEMORANDUM OF POINTS AND
     AUTHORITIES IN SUPPORT OF
     DEFENDANT'S MOTION FOR
     SUMMARY JUDGMENT

     Judge:      Victor Marrero

------------------------------------------------------- x

## DEFENDANT'S CONCISE STATEMENT OF UNDISPUTED MATERIAL FACTS

      Defendant AstraZeneca LP ("AstraZeneca"), pursuant to Local Civil Rule 56.1, submits

this Concise Statement of Undisputed Material Facts in support of its contemporaneously filed

Motion for Summary Judgment.

**I.      Background**

      1.      AstraZeneca is engaged in the business of research, development, and

manufacturing of pharmaceutical products designed to fight disease in major areas of healthcare.

Defendant Astrazeneca's Appendix of Record Evidence In Support of Motion for Summary

Judgment ("Appx."), Tab 11, Declaration of Debra Ventura ("Ventura Dec."), ¶ 3.

      2.      AstraZeneca employs thousands of individuals, including a field-based sales force

of Pharmaceutical Sales Specialists ("Sales Specialists").  Appx., Tab 11, Ventura Dec., ¶ 3.

      3.      AstraZeneca hired Plaintiff Holly Hummel ("Hummel") as a Sales Specialist in

December 1999, and she held this position until October 14, 2005.  Appx., Tab 1, Deposition

testimony of Plaintiff Holly Hummel ("Hummel Tr."), 10:23-11:7, 12:10-13; Id., Tab 12, Resume; see also id., Tab 1, Hummel Tr., 33:14-34:23, 35:4-36:5 (admitting resume is accurate).

4.      As a Sales Specialist, Hummel worked in several different therapeutic areas, including AstraZeneca's cardiovascular group, long term care group, and specialty care group. Appx., Tab 1, Hummel Tr., 15:2-9, 71:13-72:8.

5.      Within each therapeutic area, Hummel worked with a small team, or "pod," of Sales Specialists with whom she coordinated her sales efforts.  Appx., Tab 1, Hummel Tr., 73:3-74:23, 197:25-198:6.

6.      Hummel sold a variety of cardiovascular and neuroscience drugs, including Atacand, Toprol-XL, Nexium, and Seroquel, all of which patients could obtain only via a doctor's prescription.  Appx., Tab 1, Hummel Tr., 89:25-91:18, 302:12-303:9.

## II.     Hummel Was an Exempt Outside Salesperson

### A.      Hummel Received Extensive Product and Sales Training

7.      AstraZeneca provided Hummel with extensive training on the products that she would be selling, and the Company likewise trained her on how to sell them.  Appx., Tab 1, Hummel Tr., 349:18-350:13.

8.      Hummel participated in "selling skills classes" and product knowledge training, including ongoing refresher training on new clinical studies and product indications (i.e. FDA approved uses).  Appx., Tab 1, Hummel Tr., 349:18-350:13, 351:7-11, 351:16-24.

9.      Hummel asked to take a "flexible selling styles" class.  Appx., Tab 1, Hummel Tr., 319:20-320:12; id., Tab 13, Email dated February 10, 2004 from Hummel to Mark Ragone; see also id., Tab 1, Hummel Tr., 319:5-9.

10.     Hummel received additional product and "marketing" training during her career as she went into different therapeutic areas.  Appx., Tab 1, Hummel Tr., 350:7-13.

LAI-2950076v2

11.    Hummel was trained on AstraZeneca's selling philosophy, the Interactive Strategic Selling ("ISS") model.  Appx., Tab 1, Hummel Tr., 94:7-14; id., Tabs 14 & 15 (documents describing the ISS model); see also id., Tab 1, Hummel Tr., 94:21-96:4, 96:16-97:5.

12.    Hummel used the ISS model in her daily activities as a Sales Specialist for the purpose of getting physicians to write prescriptions for more AstraZeneca products.  Appx., Tab 1, Hummel Tr., 94:21-96:4, 96:16-97:10, 98:10-15; id., Tabs 14 & 15 (documents describing the ISS model).

13.    Among other things, the ISS model included an "Emphasis on closing — asking for the business."  Appx., Tab 15, ISS Presentation 2004, at AZB_C0003578; see also id., Tab 1, Hummel Tr., 96:12-97:5, 97:6-10.  It also described various general types of Sales Aids that a Sales Specialist could use during a sales call (id., Tab 15, at AZB_C0003595, C0003656) in order to increase the chance of an effective interaction (id., at AZB_C0003657); required the Sales Specialist to use a "complex thinking process" in having a dialogue with a physician (id. at AZB_C0003615); asked Sales Specialists to "leverage current success" with physicians to "expand market" and "motivate customer to switch from competitive product."  Id., at AZB_C0003645.  The ISS model also focused on having Sales Specialists making a "close" — "a well timed & well stated question to garner business."  Id., at AZB_C0003671.  "Closing" was defined as important in the ISS model because "If you don't **_ASK_**, you don't **_GET_**!"  Id. at AZB_C0003672 (emphasis in original).

14.    In her role as a "Crestor training champion," Hummel ensured that Sales Specialists were prepared for the product launch.  Appx., Tab 1, Hummel Tr., 66:20-67:14.

15.    Hummel even trained other Sales Specialists on how to use the ISS model when she served as a "district training champion."  Appx., Tab 1, Hummel Tr., 95:16-25, 307:16-

308:6; <u>id.</u>, Tab 14, ISS Presentation Materials - 2001; <u>id.</u>, Tab 1, Hummel Tr., 94:21-96:4; <u>id.</u>, Tab 16, Email dated December 30, 2000 from Andrew Strow regarding District Specialists, at 141480; <u>id.</u>, Tab 1, Hummel Tr., 306:11-20.  Hummel also gathered and summarized competitor products for background and analysis purposes.  <u>Id.</u>, Tab 1, Hummel Tr., 307:11-15; <u>id.</u>, Tab 16, Email dated December 30, 2000 from Andrew Strow regarding District Specialists, at 141479; <u>id.</u>, Tab 1, Hummel Tr., 306:11-25.

**B.      Hummel's Job Was to Increase Sales of AstraZeneca Products by Engaging Physicians in Persuasive Dialogues and Asking for Commitments to Prescribe AstraZeneca Products for Approved Uses**

16.      As a Sales Specialist, Hummel's job was to persuade doctors to write more AstraZeneca product prescriptions for appropriate patients in order to generate sales revenue.  Appx., Tab 1, Hummel Tr., 31:10-21, 38:22-39:4, 194:12-21.  Hummel's goal was to increase prescription growth among her physician customers.  <u>Id.</u>, 304:5-13.

17.      Hummel was evaluated on, among other things, her skills as a salesperson.  Hummel admitted that a highly important measure of her performance from the Company's perspective was "[n]umbers", <u>i.e.</u> her ability to move market share.  Appx., Tab 1, Hummel Tr., 51:17-23, 286:14-20.  Further, Hummel's annual evaluations contained a description of Hummel's territory sales objectives and an assessment of Hummel's efforts to achieve those objectives.  <u>See</u>, <u>e.g.</u>, <u>id.</u>, 121:10-123:25; <u>id.</u>, Tab 2, 2002 Performance Evaluation.

18.      Furthermore, sales performance was an important factor in determining whether Hummel was ready to be promoted.  Appx., Tab 17, Deposition testimony of Cindy Atha, 100:13 –101:5; <u>see</u> <u>also</u> <u>id.</u>, Tab 18, Career Ladder Self Evaluation; <u>id.</u>, Tab 1, Hummel Tr., 148:21-150:2, 150:22-151:10.

19.      Likewise, Hummel's manager accompanied her on sales calls approximately every 3-4 weeks, and in connection with these "ride alongs" the manager prepared "field

coaching forms" that contained the manager's evaluation of Hummel's selling skills, such as "sell to the need" and "close," as well as her activities and accomplishments in the field for that day. Appx., Tab 1, Hummel Tr., 278:5-17, 280:16-19, 281:3-15, 290:8-24; id., Tabs 3-4, 19, Field Coaching Forms. See also id., Tab 1, Hummel Tr., 287:4-288:5, 288:7-17, 291:3-292:20.

20.     A portion of Hummel's compensation was tied to achievement of sales targets and product sales within her assigned geography. Appx., Tab 1, Hummel Tr., 175:6-9, 313:21-314:23, 330:18-331:11, 332:6-10, 332:15-333:10, 341:11-14, 346:7-347:15; id., Tab 5, Email dated October 27, 2003 from James Ader; id., Tab 6, Email dated July 4, 2001 from Andrew Strow; id., Tab 7, Email Dated July 1, 2004 from Mark Ragone; id., Tab 11, Ventura Dec., ¶ 5.

21.     Hummel was responsible for calling on numerous physicians in her territories, and she considered such physicians to be her "clients." Appx., Tab 1, Hummel Tr., 38:4-19.

22.     Hummel also understood that AstraZeneca wanted her to call on physicians and others with prescribing authority because they had the authority to prescribe its products. Appx., Tab 1, Hummel Tr., 302:12-303:20.

23.     During her calls, Hummel engaged the doctors in persuasive dialogues designed to increase the number of AstraZeneca prescriptions that they wrote for approved uses:

> I mean, the goal was -- is that to increase, you know,
> prescriptions. Was a goal, is what we were told. So this is
> what, you know, we want to do. Go in, market, use the
> core selling method, talk to the physicians in hopes that that
> would deliver results.

Appx., Tab 1, Hummel Tr., 303:21-304:12; see also id., 31:5-21 (testifying that the purpose of making calls on doctors was to convince the doctor "to write [prescriptions for] the product, or products, that you were marketing").

24.     Hummel admitted that she used the ISS model to acquire new business – i.e., new prescriptions — for AstraZeneca. Appx., Tab 1, Hummel Tr., 152:21-153:6.

25.     Hummel testified that her performance goals for 2001 included 32,736 prescriptions for Toprol XL and 41,135 prescriptions for Zestril/Zestoretic.  Appx., Tab 1, Hummel Tr., 22:6-25:6, 26:2-27:19; Appx., Tab 8, 2001 Performance Plan, at 160267.

**C.     Hummel Made Sales And Obtained Orders**

26.     Hummel admitted that her job was to sell.  In describing how her AstraZeneca experience helped her get a job at Novartis, Hummel stated: "I had been both in hospital selling as well as office selling, so they – they liked that."  Appx., Tab 1, Hummel Tr., 49:2-25.  She also stated that one of her job duties was working with other Sales Specialists "to coordinate selling efforts."  Id., 197:25-198:6.  She further testified that she "sold Seroquel."  Id., 50:17.

27.     Hummel used a professional to draft a resume on her behalf.  Appx., Tab 12, Resume; id., Tab 1, 33:14-34:23.  Hummel testified in her deposition that she approved the resume, it was accurate (except for the title of her degree), and she intends to use it in future job searches.  Id., Tab 1, Hummel Tr., 34:14-23, 35:4-36:5.  In her resume, Hummel was described as a "Senior Sales Professional with extensive . . . experience in pharmaceutical sales; a results-driven producer adept at building and retaining client relationships [and] conducting in-depth sales presentations…"  Appx., Tab 12, Resume; id., Tab 1, 33:14-34:23.

28.     Hummel's resume also stated that, among other products, she "sold Seroquel," and she "sold cardiovascular pharmaceuticals (Crestor) to physicians, cardiologists and hospitals."  Appx., Tab 12, Resume; id., Tab 1, Hummel Tr., 33:14-34:23, 35:4-36:5.

29.     Hummel wrote in an email that she was "taking a promotion in the Long Term Care division-selling Nexium and Seroquel."  Appx., Tab 20, Email dated October 18, 2002 from Hummel to Carianne Fugich; see also id., Tab 1, Hummel Tr., 313:8-11, 317:8-24.

30.     One of Hummel's initiatives that she admitted executing in her 2004 Personal Scorecard was to "continue to ask for business on every call/interaction."  Appx., Tab 9, 2004

Personal Scorecard, at 143838; <u>see</u> <u>also</u> <u>id.</u>, Tab 1, Hummel Tr., 126:8-24, 127:12-24, 130:4-6. Hummel also admitted that her manager expected her to "close" (<u>i.e.</u> ask for a commitment) at the conclusion of the calls that she made.  <u>Id.</u>, Tab 1, Hummel Tr., 313:4-7, 315:17-316:3, 317:2-7; <u>id.</u>, Tab 10, Email dated June 22, 2005 from Brian Heffernan to Hummel; <u>see</u> <u>also</u> <u>id.</u>, Tab 15, Presentation on ISS model at AZB_C0003578, 3671-72, 3679; <u>id.</u>, Tab 1, Hummel Tr., 96:12-97:5, 97:6-10, 290:5-24.

31.    Hummel understood her role was to increase market share for AstraZeneca's products.  Hummel was proud of herself when her manager congratulated her for an increase in market share.  Appx., Tab 1, Hummel Tr., 313:4-7, 315:17-316:25; <u>id.</u>, Tab 10, Email dated June 22, 2005 from Brian Heffernan to Hummel.  Furthermore, one of Hummel's initiatives that she admitted executing in her 2004 Personal Scorecard was "…achieving Seroquel market share growth…."  <u>Id.</u>, Tab 9, 2004 Personal Scorecard, at 143837; <u>see</u> <u>also</u> <u>id.</u>, Tab 1, Hummel Tr., 126:8-24, 127:12-24, 130:4-6.

32.    Hummel "demonstrate[d] a good understanding of the ISS selling model" and used it to acquire new business.  Appx., Tab 18, Career Ladder Self Evaluation, at 143640; <u>id.</u>, Tab 1, Hummel Tr., 148:21-150:2, 150:22-151:10.

**D.    Hummel Spent Almost All Of Her Work Time Traveling To And Selling At Physician's Offices**

33.    Hummel spent the vast majority of her working time in the field making calls to doctors in her territory.  Appx., Tab 1, Hummel Tr., 176:15-23.  In making these calls, Hummel was almost wholly free of direct supervision – she worked in the field alone most of the time, and her manager accompanied her on "ride-alongs" only once every 3-4 weeks or once every month.  <u>Id.</u>, 79:10-13, 280:4-15, 278:9-17; <u>see</u> <u>also</u>, 279:8-280:3 (testifying that managers met her for programs about once every two months).

34.     Hummel testified that she approximately worked between 8 and 12 hours per day (not including drive time to the first call and back from the last call in the field).  Appx., Tab 1, Hummel Tr., 228:2-23; 245:13-21; 246:11-15; 247:5-7.

## III.   Hummel Qualified for the Administrative Exemption

### A.     Hummel Meets The Salary Test

35.     Hummel earned an annual base salary of $50,158 effective November 1, 2001; $52,164 effective March 1, 2002; $54,251 effective September 1, 2002; $55,878 effective November 1, 2002; $56,996 effective March 1, 2003; $61,342 effective September 1, 2003; $63,796 effective March 1,2004; and $68,000 effective August 1, 2004 through Hummel's termination of employment on or about October 15, 2005.  Appx., Tab 11, Ventura Dec., ¶ 5.

### B.     Hummel's Primary Duty Was Management or General Business Operations

36.     Hummel testified that she spent the vast majority of her time as a PSS calling on physicians.  Appx., Tab 1, Hummel Tr., 176:15-23.

37.     Hummel testified that she was successful in promoting Atacand in her district. Appx., Tab 1, Hummel Tr., 54:10-15.

38.     Hummel testified that AstraZeneca's "marketing materials used promotional terminology."  Appx., Tab 1, Hummel Tr., 367:9-16.

39.     Hummel wrote in the "Initiatives" section of her 2004 Personal Scorecard that she would "[c]ontinue to promote Nexium…."  Appx., Tab 1, Hummel Tr., 126:8-24, 127:12-24; id., Tab 9, 2004 Personal Scorecard, at 000143836.  Hummel testified that she actually executed the initiatives that she wrote in her 2004 Personal Scorecard.  Id., Tab 1, Hummel Tr., 130:4-6.

40.     Hummel testified that she discussed the promotion of AstraZeneca products with pharmacists.  Appx., Tab 1, Hummel Tr., 241:7-10.

41.    Hummel admitted that her financial objective in her 2002 Performance Evaluation was to achieve total prescription goals for her "promoted Cardiovascular products."  Appx., Tab 1, Hummel Tr., 121:10-122:17; Tab 2, 2002 Performance Evaluation, at 000139840.

42.    In describing her job duties, Hummel testified "I marketed to physicians."  Appx., Tab 1, Hummel Tr., 359:15-16.

**C.    Hummel's Primary Duty Included The Exercise Of Discretion And Independent Judgment**

43.    Hummel admitted that during a sales call, she would uncover the physician's need and work that need into the product discussion so that the doctor would write more prescriptions. Appx., Tab 1, Hummel Tr., 257:24-258:11.

44.    Hummel conceded that doctors reacted differently to sales calls and that their interests varied.  Appx., Tab 1, Hummel Tr., 257:8-22, 258:21-25.  Some doctors would spend more time with her, and others would "just have questions."  Id., 257:19-22.

45.    Hummel admitted that there are various ways to present information during a sales call and there are several different topics that a Sales Specialist could cover with a doctor who is an expert.  Appx., Tab 1, Hummel Tr., 260:4-18, 357:4-7.

46.    Hummel testified that doctors would ask questions that were not covered in AstraZeneca training.  Appx., Tab 1, Hummel Tr., 354:3-9.

47.    Hummel testified that she would do pre-call planning 1-2 times a day.  Appx., Tab 1, Hummel Tr., 247:24-248:4.  In creating her plan, she would review the names of people in the office who had influence.  See id., at 248:7-22.  She would sometimes review the doctor's prescribing history.  See id., 248:23-249:9.

48.    During her pre-call planning, Hummel would also prepare an opening message and select the marketing materials she wanted to use in her sales call.  Appx., Tab 1, Hummel

- 9 -

Tr., 252:6-17.  Hummel admitted that the materials she used and the opening messages would differ from call to call.  Id., at 253:1-10.  Indeed, Hummel testified:

> Q.   Okay.  And so based on what you did have -- I mean, what came out at the end of the pre-call planning?  Did you have a game plan to go into the office?
>
> A.   Yeah.  You would have a -- you know, an opening statement that you wanted to make, and how you wanted to bridge into the marketing piece, maybe what -- what page you wanted to use in the marketing piece, because if you only have 30 seconds, a lot of times you can just cover – you couldn't go through the entire piece, because it's page by page.
>       So you might think about, you know, I'm just going to use this page today.  And so you'd know that before you went in.  You might have an opportunity to do it, you might not.
>
> Q.   You would have to make some call as to what would be the most effective page to use.  Is that right?
>
> A.   Yes.  It may just be the call message.
>
> Q.   That may be it.
>
> A.   Yes.
>
> Q.   Maybe something else.
>
> A.   Correct.
>
> Q.   Okay.  Did all your pre-call plans end up with the same result?  I mean, you did the same thing every time, same page of the CVA every time?
>
> A.   Did I use the same page every time?
>
> Q.   Right.
>
> A.   No.
>
> Q.   And did you have the same opening statement every time?
>
> A.   No.

Id., 252:2-253:10.

49.     Hummel testified that she would sometimes review a physician's prescribing history but she often found that some of the data provided by AstraZeneca was not specific enough to be useful for the cultivation of her local market.  Appx., Tab 1, Hummel Tr., 20:16-21:3.  She further testified that to overcome this limitation, she would have to come up with information herself in order to figure out what to do.  Id., 21:19-25.  Indeed, she stated: "You know, you had to kind of put it all -- a little bit of each piece together and draw your own conclusion."  Id., 21:8-11.

50.     Hummel also testified that she managed a budget for programs she conducted.  See Appx., Tab 1, Hummel Tr., 297:2-21.  AstraZeneca did not direct her to spend a certain amount of money on a particular physician.  Id., 297:9-13.  Hummel testified that she and her manager would approve the expenditures that she thought were appropriate.  Id., 297:18-21; see also id., 145:13-21.

51.     Hummel has described her use of discretion and independent judgment on various occasions.  In her Career Ladder Self Evaluation, which she completed and submitted in seeking a promotion (and which she wrote in the third person), she wrote, among other things, that she:

- has used her budget to capitalize on establishing herself in her new territory.  She has used regional meetings to interact with her counterparts and gain insight on the territory and on customers, which they share as well as getting together on a regular basis to discuss the territory.  She has established relationships with people in departments who have access to information and can be used as resources…

- is successful in handling both routine and new situations on her own.  She recognizes the impact of actions and takes appropriate steps to solve the problem.

- is very cognizant of when to be more/less aggressive when selling to physicians.

- gains knowledge of disease states and related products through self-study. This was evident with her promotion to LTC and her learning Seroquel and Nexium.

- …has focused on doctors that have an immediate and dramatic impact on the business.

- continues to gain access in key accounts by establishing long term relationships, doing lunch/learns and thinking outside of the box, in turn setting herself apart…Holly follows her own judgment in the face of opposition….

- developed strategies to penetrate her significant accounts. This is evidenced in her business action plans. She proactively addresses obstacles that may impede account progress…

- has met and developed a business plan with all of her counterparts (CNS and Hospital) that incorporate short-term goals and long-term business objectives. She understands the different associations to which LTC could benefit and their impact on physicians and other key customers. She has participated in association meetings, such as NYASCAP to help build relationships.

Appx., Tab 18, Career Ladder Self Evaluation, at 000143640-641; id., Tab 1, Hummel Tr. 148:21-150:9, 150:22-151:10.

52.     In her resume, which she wrote, Hummel described herself as a "highly motivated, resourceful, and high energy Pharmaceutical Sales Professional with progressive management, administrative and troubleshooting experience within intensive customer service environment." Appx., Tab 21, 2002 Resume; see also id., Tab 1, Hummel Tr., 36:8-21, 37:4-38:3. She further stated that she is a "tenacious problem solver who ascertains needs and goals, identifies difficulties and formulates and implements strategic solutions to increase effectiveness and productivity within budgets and time frames." Id., Tab 21, 2002 Resume. Hummel testified that the resume was accurate. Id., Tab 1, Hummel Tr. 37:23-38:3.

53.     In her resume, which she wrote, Hummel described her Sales Specialist job duties as the following:

LAI-2950076v2

Organize, coordinate, and assume authority for daily activities, functions, and decisions; set priorities activate methodologies, and create plans for workflow and distribution. Utilize extensive leadership abilities to administer and promote company policies and procedures to attain specific organizational goals. Maintain open channels of communication to result in optimum delivery of service in an environment that fosters self-motivation, team concepts and responsible business development. Monitor operating budgets and direct the utilization of resources to effectively accomplish goals with the budgeted framework. Interact and consult with clients: assess and analyze specific situations and individual needs to move business. Establish procedures for excellent customer service including fielding, investigation, and resolving complaints and issues in a timely manner to preserve positive alliances.

Appx., Tab 21, 2002 Resume; see also id., Tab 1, Hummel Tr., 36:8-21, 37:4-38:3.

54.     In her 2004 Personal Scorecard, Hummel wrote that her initiatives would be to, among other things:

- Analyze data on a regular basis from CNS counterparts, early view and pharmacy providers

- Leverage deployed resources (CSM, MIS) and valued added resources (NQL, vouchers, etc.) to access difficult customers and drive share

- Team with pharmacy providers and counterparts to identify key prescribers, influencers and consultants

- Ensure development and execution of precall analysis, critical information seeking and strategic influencing

- [Participate in] cylinder meetings to plan, target and address business ongoings with pod members

- Meet[] with LTC counterparts to plan business strategies within our overlapping targets

- Enhance clinical knowledge by keeping abreast with journals and new information related to disease states

- …start researching best possible ways to influence business at Group homes and Adult homes;

- …attend pharmacy provider preceptorship if offered again

Appx., Tab 9, 2004 Personal Scorecard, at 000134836-839; see also id., Tab 1, Hummel Tr., at 126:8-24, 127:12-24.  Hummel admitted that she actually executed these initiatives.  Id., Tab 1, Hummel Tr., 130:4-6.

55.    Hummel used a professional to draft a resume on her behalf.  Appx., Tab 12, Resume; id., Tab 1, 33:14-34:23.  Hummel testified in her deposition that she approved the resume, it was accurate (except for the title of her degree), and she intends to use it in future job searches. Id., Tab 1, Hummel Tr., 34:14-23, 35:4-36:5.  In her resume, Hummel was described as a "Senior Sales Professional . . . [adept at] efficiently managing a territory and ensuring bottom-line profitability."  Appx., Tab 12, Resume; id., Tab 1, Hummel Tr., 33:14-36:5.  It further stated that, while working for AstraZeneca, Hummel "[p]repared detailed business plans of action designed to increase market share" and that she "[m]anaged and built the Westchester territory." Id., Tab 12, Resume.

56.    When applying for the long term care Sales Specialist position, Hummel described herself as a "quick learner and a good strategic thinker who can digest complex information and build a coherent actionable structure from it.  I am also very good at sensing opportunities and creating ways to capitalize on them."  Appx., Tab 22, Email dated October 15, 2002 from Hummel to George Venidis; id., Tab 1, Hummel Tr., 109:4-20, 116:23-117:4.

57.    Hummel's manager accompanied her on sales calls approximately every 3-4 weeks, and in connection with these "ride alongs" the manager prepared "field coaching forms" that contained the manager's evaluation of Hummel's selling skills, activities and accomplishments in the field for that day.  Appx., Tab 1, Hummel Tr., 278:9-17, 280:16-23.  On one such field coaching form, her manager wrote that Hummel "puts considerable thought into selecting the appropriate message, preparing the sales dialogue, and selecting the supporting

materials." Appx., Tab 19, March 2000 Field Coaching Form, at 167685; see also id., Tab 1, Hummel Tr., 287:4-288:5.

58.     Hummel testified that on most days, she performed her work without management personnel observing her. Appx., Tab 1, Hummel Tr., 79:10-13, 280:4-15. She stated that she was accompanied by management in a ride-along about once every 3-4 weeks or every month. Id., 278:9-17. Other than ride-alongs, her supervisors did not accompany her in the field unless they met her at a program, which occurred once every two months. Id., 279:8-280:3.

59.     Hummel used the ISS model in her daily activities as a Sales Specialist. Appx., Tab 1, Hummel Tr., 96:16-97:10, 98:5-15. The ISS model called for a "dialogue, not only a presentation", and encouraged PSS's to engage in a "dynamic dialogue" that involved a "complex thinking process" by the PSS. Id., Tab 15, ISS Presentation - 2004, at AZB_C0003574, 3589-90, 3615; see also id., Tab 1, Hummel Tr., 96:16-97:10.

## IV.   Termination of Hummel's Employment

60.     Hummel's employment with AstraZeneca ended on October 14, 2005. Appx., Tab 1, Hummel Tr., 11:4-7.

61.     On November 17, 2005, Hummel, in exchange for a cash payment of more than $13,000 and other settlement benefits, executed a Mutual Consent Release Agreement. Appx., Tab 1, Hummel Tr. 189:2-18, 190:14-21; id., Tab 23, Release.

62.     The release signed by Hummel specifically waived any state law claims pertaining to Hummel's employment that arose prior to the effective date of the Release. Specifically, it waived:

> [A]ny and all … causes of actions, suits, debts, claims and demands . . . which [Hummel] ever had, now has, or hereafter may have . . . . by reason of any matter, cause or thing whatsoever which has occurred in the past up to the date of execution of this Agreement and, particularly, but without limitation of the

foregoing general terms, any federal, state, or local claims arising from or relating in any way to [Hummel's] employment relationship or the termination of [Hummel's] employment relationship with [AstraZeneca].

Appx., Tab 23, Release, ¶ 3; see also id., Tab 1, Hummel Tr., 189:2-18.

63.    Hummel certified that she "carefully read the terms of this Release …, that [she] underst[ood] them, and that [she] voluntarily enter[ed] into the Release with the intention of releasing all claims…."  Appx., Tab 23, Release, ¶ 6; id., Tab 1, Hummel Tr., 189:2-18. Hummel also testified that she had the opportunity to and did in fact review the Release.  Appx., Tab 1, Hummel Tr., 190:22-191:3.

64.    Hummel was provided a period of 21 calendar days within which to consider whether to sign the Release, and was afforded the right to revoke the Release within seven days of signing the Release.  Appx., Tab 23, Release, ¶ 8.  Hummel testified that she signed the Release and did not revoke it.  Id., 189:2-18, 191:4-6.

65.    AstraZeneca also "advised [Hummel] to consult with an attorney prior to executing the Release."  Appx., Tab 23, Release, ¶ 15; id., Tab 1, Hummel Tr., 189:2-18. Hummel was in fact represented by an experienced New York employment attorney in negotiating the Release with AstraZeneca.  Id., 185:21-186:7.

- 16 -

Dated:  May 30, 2008                      Jones Day

By:  /s/ Shari M. Goldsmith
      Matthew M. Lampe (*pro hac vice*)
      Shari M. Goldsmith  (SG 0909)
      JONES DAY
      222 East 41st Street
      New York, NY  10017
      Telephone: (212) 326-3939
      Facsimile: (212) 755-7306
      mwlampe@jonesday.com
      smgoldsmith@jonesday.com

      Harry I. Johnson, III (*pro hac vice*)
      JONES DAY
      555 S. Flower Street
      Fiftieth Floor
      Los Angeles, CA  90071
      Telephone: (213) 489-3939
      Facsimile: (213) 243-2539
      harryjohnson@jonesday.com

      Theresia Moser (*pro hac vice*)
      JONES DAY
      1420 Peachtree Street, N.E.
      Suite 800
      Atlanta, GA 30309
      Telephone: (404) 521-3939
      Facsimile:  (404) 581-8330
      tmoser@jonesday.com

      *Attorneys for Defendant*
      *AstraZeneca LP*

LAI-2950076v2

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on May 30, 2008, the foregoing was served

electronically and by U.S. first class mail upon the following counsel who have registered with

ECF:

Charles Joseph
Michael Palmer
JOSEPH & HERZFELD
757 Third Avenue, Suite 2500
New York, New York 10017
Tel: 212-688-5640
Fax: 212-688-2548

James A. Jones
GILLESPIE, ROZEN, WATSKY & JONES, P.C.
3402 Oak Grove Avenue
Suite 200
Dallas, TX 75204
Tel: 214-720-2009
Fax: 214-720-2291

/s/ Shari M. Goldsmith
Shari M. Goldsmith (SG-0909)
Jones Day
222 East 41st Street
New York, NY 10017-6702
smgoldsmith@jonesday.com
(212) 326-3939