UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x
HOLLY MARIE HUMMEL, on behalf of          )    No. 07-CV-5473 (VM)
herself and others similarly situated,            )
                                                                 )
            Plaintiff,                                       )
                                                                 )    **DECLARATION OF HOLLY**
            -against-                                      )    **HUMMEL IN OPPOSITION TO**
                                                                 )    **DEFENDANT'S MOTION FOR**
ASTRAZENECA PHARMACEUTICALS    )    **SUMMARY JUDGMENT**
LP,                                                             )
                                                                 )
            Defendant.                                   )
                                                                 )
-------------------------------------------------------

      I, HOLLY HUMMEL, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

      1.    I am a New York resident and the named plaintiff in this class action. I submit this declaration based upon personal knowledge unless otherwise indicated. If called upon to do so, I could and would competently testify thereto.

      2.    I was employed as a Pharmaceutical Sales Specialist ("PSS") by AstraZeneca Pharmaceuticals, LP ("AZ") from approximately December 1999 through October 2005.

      3.    While at AZ, I held that title of cardiovascular PSS, long-term care PSS, and specialty care PSS. While my duties with each title were slightly different, my primary function was to call on health care providers and promote AZ products. Based upon my experience and observation of other PSSs, all PSSs have the same primary job function.

      4.    Throughout my employment with AZ, I covered territory in New York. The territories that I covered included New York City, Westchester County, and Long Island.

      5.    During my employment with AZ, I consistently worked over eight hours a day and 40 hours a week. I worked approximately 10 hours per weekday and also four to eight hours on weekends. It was generally understood that a PSS would have to work over forty hours per

week to perform all required job duties and tasks. Like all PSSs, I did not receive overtime compensation for working over eight hours per day or 40 hours per week.

6. AZ paid me a salary. I also received a bonus based upon an estimate of the number of prescriptions written by doctors in my territory. The bonus was only a small percentage of my annual wages. Based upon my observations and interactions with other PSSs, I believe this was the same for all PSSs.

7. During the course of my employment with AZ I had different district managers. However, my primary job duty remained the same.

8. I attended national meetings for PSSs at least once a year, and as a result spoke with hundred of PSSs about our job duties and AZ policies. I also regularly attended smaller meetings with PSSs from the region. As a result of these meetings and my conversations and observations of other PSSs, I know that all PSSs had similar job duties.

9. As a PSS, my primary job duty (and the duties of all PSSs that I have observed and communicated with) was to visit physicians in my territory, give the physicians pre-approved messages about AZ products, and respond to physicians' questions from information provided by AZ. I acted as a one-to-one advertisement for AZ; my goal was to keep AZ products in the minds of doctors so that they might consider prescribing AZ products in the future. Based upon my observations and interactions with other PSSs, I believe this was the same for all PSSs.

10. All aspects of my visits (or "calls") with doctors were strictly controlled by AZ. I received intensive training, dictating how to interact with physicians. I was required to stay within FDA guidelines and stay within the scripted company message at all times. I was to present only information provided to me from AZ. Each and every piece of printed or written materials (*e.g.* visual aids) that I utilized or provided to doctors was pre-approved and supplied by AZ. I was also trained on how to present these materials and given scripted messages about the AZ product. Based upon my observations and interactions with other PSSs, I believe this was the same for all PSSs.

11. On each call, I was required to deliver the company's core message and use the company's printed materials (*e.g.* visual aids). I could not deviate from the core message or the material when I called upon a physician. Even if I thought another core message would be more effective with a particular physician, I did not have the discretion to develop and utilize another core message, as I was evaluated on my ability to deliver the approved core message. Deviating from the core message was against company policy. I did not have the discretion to alter, mark up, or create my own visual aids, even if in my judgment they would have been more effective than those approved by AZ, as I was evaluated on my use of AZ approved visual aids. I was also directed how to utilize and - if allowed - present the printed materials that AZ provided to me. Some materials were for my information only, and I could not provide them to a physician, even if I thought showing or discussing such material with a physician would be helpful.

12. AZ provided me a list of doctors in my territory to see and instructed me how many times I was to visit a particular physician each month. AZ instructed me on what products I should talk to the physicians about, what message or information to provide to the doctors, and the order that I should present the message. I was allowed the minor freedom to choose the order of the doctors that I saw, based on location, the schedule of other PSSs calling on the same doctors, and the hours and days that physicians would see PSSs. I could add doctors to my call list, but those doctors had to be approved by my District Manager. I could remove doctors from my list, but only if they moved out of my territory, retired, or died. Based upon my observations and interactions with other PSSs, I believe this was the same for all PSSs.

13. Because doctors tend to be very busy, my average actual time with a doctor would be less than a minute, although I would oftentimes have to wait a long period of time before seeing a doctor.

14. Other PSSs would visit the same physicians and present the same information as me.

15. PSSs – including myself – were required to visit eight to ten physicians per day.

3

16. Although AZ referred to PSSs as "sales reps" or "sales professionals," I never considered myself a salesperson. Physicians did not purchase anything from me, and I did not sell anything for AZ.

17. There was no requirement that a PSS had to have a background in science or medicine. I knew of several PSSs that had received Bachelors degrees in fields that were unrelated to science or medicine, yet they were able to perform the functions of the job.

18. The job of a PSS does not require a high degree of technical knowledge. AZ provides PSSs with all the information they need to know about the pharmaceutical products. PSSs use the company-approved visual aids to convey the aspects of a product that the Company deems important. Most of the visual aids provided to PSSs were too detailed to convey all of the information contained therein to a doctor, and AZ did not expect us to convey all the information provided in a visual aid. The company wanted us to focus on certain points. Also, the clinical reprints that we could show to doctors on calls were also too dense and complex to convey all the information contained therein to a doctor on a call. AZ wanted us to focus only on certain findings in the clinical reprint. Moreover, the brevity of the majority of my calls with physicians did not allow me to go into the details of a visual aid or clinical reprint. I only had time to convey a core message and perhaps leave a reprint with a physician.

19. I did not enter into contracts or obtain binding commitments from physicians that they would prescribe AZ products in the future. Moreover, I did not receive any guarantee from the doctor that they would prescribe the products to patients in the future, nor would it would have been ethical for a doctor to make such a guarantee. AZ told PSSs to ask for a "commitment" from a physician to prescribe AZ products; nevertheless, even if the physician did give a commitment, it was not binding. Even if they gave a commitment, Physicians were free to do as they chose and they would frequently end up not prescribing the products. There was nothing AZ or I could do to enforce the commitment by the physician.

20. I never collected money or received any other form of payment from physicians in exchange for AZ products (or for any good or service).

21. I never took or placed orders for any AZ product.

22. I never negotiated prices for any AZ product.

23. Physicians did not purchase AZ products from me, nor did the physicians purchase these prescription drugs for their patients.

24. I had no authority to consummate a sale; indeed, it would have been illegal for me to do so. Pursuant to federal and state laws, AZ prohibited me from giving healthcare providers AZ products in exchange for anything, and I was not permitted to directly recommend AZ products to patients/end-users.

25. I did not have any role in transferring title of AZ products to any of its customers -- including wholesalers, retailers, pharmacies, or end-users -- and a physician who prescribes AZ's products does not take title or ownership of any of AZ's products.

26. After visiting the doctors, I was required to enter notes about the interaction into a computer and send this information to AZ. I was also required to check all of my emails and voice mails, work on expense reports, and reload my car for the next day. Based upon my observations and interactions with other PSSs, I believe this was the same for all PSSs.

27. Upon starting at AZ, I received training on AZ pharmaceutical products as well as training on how to present information about the pharmaceutical products to doctors. I continued to receive training throughout my employment with AZ. As part of training, PSSs engaged in a role-play where one Rep pretended to be a doctor. Based upon my observations and interactions with other PSSs, I believe this was the same for all PSSs.

28. I also received continuing training and evaluation from my district manager who would sometimes accompany me on visits with doctors (i.e. "ride-along") and provide feedback about the interactions. Based upon my observations and interactions with other PSSs, I believe this was the same for all PSSs.

29. AZ required me to have lunches, dinners, and speaker programs for doctors. Based upon my observations and interactions with other PSSs, I believe this was the same for all PSSs. I was given a budget to have programs for doctors, but I needed my District Manager's

approval before I conducted a program, because my District Manager could preclude me from holding a program if he or she thought it would not be a worthwhile endeavor.

30. I was required to have at least one speaker program each quarter, and most of the time I was required to conduct more than one. AZ provided me a list of approved speakers.

31. I did not regularly take personal lunches. Approximately 2-3 days per week I had a working lunch with a doctor. Typically, I would eat my lunch while driving to see other doctors or performing other work. Based upon my observations and interactions with other PSSs, I believe this was the same for all PSSs.

32. On the weekends and when I was not in the field visiting doctors, I worked from home on administrative work, including reading and responding to-emails, speaking with other AZ employees, and preparing reports, and working on assigned projects. I was required to check my voice mail 3 times per day Monday through Friday. Also on the weekends, I was sometimes required to travel to national and regional meetings and scheduled speaker programs and activities. Based upon my observations and interactions with other PSSs, I believe this was the same for all PSSs.

33. When I worked for AZ, I did not have supervisory responsibility over anyone. I was closely supervised by my District Managers. District Managers regulated my activities through telephone calls, email communications, calls logs, weekly reports, and ride-alongs.

34. Throughout my employment with AZ, I received the majority of my compensation in base salary. I also received a smaller portion of my annual compensation (approximately 20%) in the form of a bonus. The bonus I received while working for AZ was not a commission as I understood it. Indeed, it was never clear to me how AZ calculated the bonus. A "quota" was established at the beginning of each year for each territory. My understanding is that the quota was related to "market share." However, AZ, at times, would change the quota throughout the course of the year, creating a moving target. I never had any input into the establishment of the quota. There also did not appear to be any correlation between reaching my quota and the amount of my bonus.

35. Another way that the calculation of my bonus was unclear was the fact that there were pharmacies (e.g. Wal-Mart) in my territory that did not report their prescription information. Thus, there was no way AZ could have accurately calculated the number of prescriptions written in my territory, which, to my understanding, was how AZ tracked my performance in relation to my quota. In addition, other PSSs called on the same physicians and discussed the same products as I did. Because of this overlap, AZ could not track if a health care provider wrote a prescription because of my efforts or because of the efforts of another PSSs calling on the same provider.

36. I received monthly reports concerning various territories. The territories were ranked according to their "sales," with the territories with the most "sales" ranked at the top of the list. There were often times that territories did not have a PSS calling on health care providers in that territory but nevertheless were ranked higher than territories where there was a PSS.

37. I did not make, affect, interpret, or implement policy for AZ. I was not involved in planning long term or short term business objectives for AZ. My primary responsibility was to visit specific doctors in my assigned territory and present information about pharmaceutical products; my efforts were not aimed at promoting sales generally. I did not promote AZ products directly to patients or end-users. Based upon my observations and interactions with other PSSs, I believe this was the same for all PSSs.

I declare under penalty of perjury under the laws of the State of New York that the foregoing is true and correct.

Executed this 10th day of June, 2008 at Suffern, New York.

_____
Holly Hummel