UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------- x

HOLLY MARIE HUMMEL, on behalf of )      No. 07-civ-5473
herself and others similarly situated, )
                         )      **PLAINTIFF'S RESPONSE TO**
           Plaintiff, )      **DEFENDANT'S LOCAL RULE 56.1**
                         )      **STATEMENT OF FACTS**
          -against- )
                         )
ASTRAZENECA LP, )
                         )
           Defendant. )
                         )

--------------------------------------------------- x

## PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Plaintiff Holly Hummel ("Hummel" or "Plaintiff"), pursuant to Local Civil Rule 56.1, submits this Opposition to Defendant's Concise Statement of Undisputed Material Facts in support of her Opposition to Defendant's Motion for Summary Judgment.

**I.      Background**

1.      AstraZeneca is engaged in the business of research, development, and manufacturing of pharmaceutical products designed to fight disease in major areas of healthcare. Defendant Astrazeneca's Appendix of Record Evidence In Support of Motion for Summary Judgment ("Appx."), Tab 11, Declaration of Debra Ventura ("Ventura Dec."), ¶ 3.

**RESPONSE NO. 1**

Undisputed.

2.      AstraZeneca employs thousands of individuals, including a field-based sales force of Pharmaceutical Sales Specialists ("Sales Specialists").  Appx., Tab 11, Ventura Dec., ¶ 3.

**RESPONSE NO. 2**

Undisputed.

3.      AstraZeneca hired Plaintiff Holly Hummel ("Hummel") as a Sales Specialist in

December 1999, and she held this position until October 14, 2005.  Appx., Tab 1, Deposition

testimony of Plaintiff Holly Hummel ("Hummel Tr."), 10:23-11:7, 12:10-13; Id., Tab 12,

Resume; see also id., Tab 1, Hummel Tr., 33:14-34:23, 35:4-36:5 (admitting resume is accurate).

**RESPONSE NO. 3**

Undisputed.

4.      As a Sales Specialist, Hummel worked in several different therapeutic areas,

including AstraZeneca's cardiovascular group, long term care group, and specialty care group.

Appx., Tab 1, Hummel Tr., 15:2-9, 71:13-72:8.

**RESPONSE NO. 4**

Undisputed.

5.      Within each therapeutic area, Hummel worked with a small team, or "pod," of

Sales Specialists with whom she coordinated her sales efforts.  Appx., Tab 1, Hummel Tr., 73:3-

74:23, 197:25-198:6.

**RESPONSE NO. 5**

Undisputed.

6.      Hummel sold a variety of cardiovascular and neuroscience drugs, including

Atacand, Toprol-XL, Nexium, and Seroquel, all of which patients could obtain only via a

doctor's prescription.  Appx., Tab 1, Hummel Tr., 89:25-91:18, 302:12-303:9.

**RESPONSE NO. 6**

Disputed. Defendant's citations to the record do not support this statement. On the cited pages, Hummel did not testify that she sold anything. Rather, Plaintiff was asked questions concerning which products she *carried*, and if patients had to obtain prescriptions to obtain AZ products. Moreover, Plaintiff did not "sell" anything.

**II.     Hummel Was an Exempt Outside Salesperson**

**A.     Hummel Received Extensive Product and Sales Training**

7.     AstraZeneca provided Hummel with extensive training on the products that she would be selling, and the Company likewise trained her on how to sell them. Appx., Tab 1, Hummel Tr., 349:18-350:13.

**RESPONSE NO. 7**

Undisputed that AZ provided Plaintiff with training. Disputed that this training indicates that Plaintiff sold anything.

8.     Hummel participated in "selling skills classes" and product knowledge training, including ongoing refresher training on new clinical studies and product indications (i.e. FDA approved uses). Appx., Tab 1, Hummel Tr., 349:18-350:13, 351:7-11, 351:16-24.

**RESPONSE NO. 8**

Undisputed that AZ provided Plaintiff with training. Disputed that this training indicates that Plaintiff sold anything.

9.     Hummel asked to take a "flexible selling styles" class. Appx., Tab 1, Hummel Tr., 319:20-320:12; id., Tab 13, Email dated February 10, 2004 from Hummel to Mark Ragone; see also id., Tab 1, Hummel Tr., 319:5-9.

**RESPONSE NO. 9**

Disputed. Defendant's citations to the record do not support this statement. Plaintiff testified that the referenced class was a requirement to obtain a promotion. Moreover, participation in this class does not indicate that Plaintiff sold anything.

10.    Hummel received additional product and "marketing" training during her career as she went into different therapeutic areas. Appx., Tab 1, Hummel Tr., 350:7-13.

**RESPONSE NO. 10**

Undisputed.

11.    Hummel was trained on AstraZeneca's selling philosophy, the Interactive Strategic Selling ("ISS") model. Appx., Tab 1, Hummel Tr., 94:7-14; id., Tabs 14 & 15 (documents describing the ISS model); see also id., Tab 1, Hummel Tr., 94:21-96:4, 96:16-97:5.

**RESPONSE NO. 11**

Undisputed that Plaintiff received training on the ISS model. Disputed that training on the ISS model indicates that Plaintiff sold anything. Moreover, Plaintiff and other PSSs were required to follow the ISS model.

12.    Hummel used the ISS model in her daily activities as a Sales Specialist for the purpose of getting physicians to write prescriptions for more AstraZeneca products. Appx., Tab 1, Hummel Tr., 94:21-96:4, 96:16-97:10, 98:10-15; id., Tabs 14 & 15 (documents describing the ISS model).

**RESPONSE NO. 12**

Undisputed that Plaintiff used the ISS model. Disputed that Defendant's citation to the record support this statement. The actual questions and answers were: Q: Okay. And when you used it for--with physicians for the purpose of getting them to write more AstraZeneca product,

right? A: That's what the company wanted us to do. Q: And you did do it, right? A: We used

this model, yes. Def. App. Tab 1 at 98:10-98:15. Furthermore, the use of the ISS model was not

an indication that Plaintiff sold anything.

13.    Among other things, the ISS model included an "Emphasis on closing — asking

for the business." Appx., Tab 15, ISS Presentation 2004, at AZB_C0003578; see also id., Tab 1,

Hummel Tr., 96:12-97:5, 97:6-10.  It also described various general types of Sales Aids that a

Sales Specialist could use during a sales call (id., Tab 15, at AZB_C0003595, C0003656) in

order to increase the chance of an effective interaction (id., at AZB_C0003657); required the

Sales Specialist to use a "complex thinking process" in having a dialogue with a physician (id. at

AZB_C0003615); asked Sales Specialists to "leverage current success" with physicians to

"expand market" and "motivate customer to switch from competitive product." Id., at

AZB_C0003645. The ISS model also focused on having Sales Specialists making a "close" —

"a well timed & well stated question to garner business." Id., at AZB_C0003671. "Closing"

was defined as important in the ISS model because "If you don't **_ASK_**, you don't **_GET_**!" Id. at

AZB_C0003672 (emphasis in original).

**RESPONSE NO. 13**

Undisputed that the quoted language appears in the referenced exhibits.  While Plaintiff

may have used the ISS model, there is no dispute that Plaintiff did not sell anything.  Defendant

strictly controlled what Plaintiff and other PSSs could relay to a doctor, because if a PSS violates

FDA guidelines, Defendant could be subject to severe fines.  Defendant mandates specific

standards and tasks that all PSSs must perform during a "sales" call.  When calling on health care

providers, all PSSs are required to follow AstraZeneca's standards for interacting with healthcare

professionals.  PSSs present information about AZ products from company-generated "detail

pieces" that are shown to physicians as part of the product presentation – a practice known as "detailing." PSSs cannot present statements out of context from the full prescribing information or approved promotional materials. They cannot highlight or mark up promotional pieces or prepare their own materials.     Stanley Int. at 8; AZB_C003828-AZB_C003829; AZB_C0001540Atha Dep. 134:21-135:7, 137:13-138:31, 40:17-141:3

14.     In her role as a "Crestor training champion," Hummel ensured that Sales Specialists were prepared for the product launch. Appx., Tab 1, Hummel Tr., 66:20-67:14.

**RESPONSE NO. 14**

Disputed that Defendant's citation to the record supports this statement. Plaintiff's role as "Crestor training champion" was to pass along information to other PSSs as to when the district manager or marketing department wanted them to take company-mandated tests concerning Crestor. Def. Appx. Tab 1 at 66:18-68:4.

15.     Hummel even trained other Sales Specialists on how to use the ISS model when she served as a "district training champion." Appx., Tab 1, Hummel Tr., 95:16-25, 307:16-308:6; id., Tab 14, ISS Presentation Materials - 2001; id., Tab 1, Hummel Tr., 94:21-96:4; id., Tab 16, Email dated December 30, 2000 from Andrew Strow regarding District Specialists, at 141480; id., Tab 1, Hummel Tr., 306:11-20. Hummel also gathered and summarized competitor products for background and analysis purposes. Id., Tab 1, Hummel Tr., 307:11-15; id., Tab 16, Email dated December 30, 2000 from Andrew Strow regarding District Specialists, at 141479; id., Tab 1, Hummel Tr., 306:11-25.

**RESPONSE NO. 15**

Disputed that Defendant's citation to the record supports this statement. Plaintiff testified that she did a presentation concerning the ISS model (Def. Tab 1 at 95:16-25), and that the

gathering and summarizing of competitor information and alleged training was simply passing along information that was provided to her by AZ. (*Id.* at 307:23-308:6.)

B.  **Hummel's Job Was to Increase Sales of AstraZeneca Products by Engaging Physicians in Persuasive Dialogues and Asking for Commitments to Prescribe AstraZeneca Products for Approved Uses**

16.  As a Sales Specialist, Hummel's job was to persuade doctors to write more AstraZeneca product prescriptions for appropriate patients in order to generate sales revenue. Appx., Tab 1, Hummel Tr., 31:10-21, 38:22-39:4, 194:12-21. Hummel's goal was to increase prescription growth among her physician customers. Id., 304:5-13.

**RESPONSE NO. 16**

Undisputed that Plaintiff's role was to promote AZ products with the hope that health care providers would prescribe the product. See also Response No. 13.

17.  Hummel was evaluated on, among other things, her skills as a salesperson. Hummel admitted that a highly important measure of her performance from the Company's perspective was "[n]umbers", i.e. her ability to move market share. Appx., Tab 1, Hummel Tr., 51:17-23, 286:14-20. Further, Hummel's annual evaluations contained a description of Hummel's territory sales objectives and an assessment of Hummel's efforts to achieve those objectives. See, e.g., id., 121:10-123:25; id., Tab 2, 2002 Performance Evaluation.

**RESPONSE NO. 17**

Undisputed that Plaintiff was evaluated on "selling skill," but disputed as to whether Plaintiff actually sold anything. Furthermore, market share increases in a particular territory do not correlate with the efforts of the individual PSS. Rather, many elements influence whether a doctor prescribes a drug, including, television and print advertisement, and the rep is merely one of those elements. Many factors impact the number of prescriptions filled in a PSS's territory,

including: visits by PSSs (multiple PSSs will call on the same doctors to promote the same product), medical education events and conventions, patient requests, television commercials, newspaper advertisements, radio advertisements, and recommendations from other physicians. AZ invests millions of dollars in print and media advertisement to promote market expansion for its drugs. Almost one third (32%) of Americans have talked to a doctor about a drug as a result of seeing a drug advertisement; in approximately half (44%) of the cases, the doctor wrote a prescription for the requested drug. Finally, some products do better in the market simply because of the nature of the market (regardless of what the PSS does). Atha dep 36:24-37:5; Ventura Dep. 395:9-11, 400:13-401:19, 406:2-408:10; USA Today Article pp. 4, 19; *Pa. Emples. Benefit Trust Fund v. Zeneca, Inc.*, 499 F.3d 239, 245 (3rd Cir. 2007)

18.    Furthermore, sales performance was an important factor in determining whether Hummel was ready to be promoted. Appx., Tab 17, Deposition testimony of Cindy Atha, 100:13 –101:5; see also id., Tab 18, Career Ladder Self Evaluation; id., Tab 1, Hummel Tr., 148:21-150:2, 150:22-151:10.

**RESPONSE NO. 18**

Disputed that Defendant's citations to the record support this statement. Atha testified that sales performance was simply "a factor," not an important factor.

Despite the fact that AZ refers to its pharmaceutical representatives as "sales specialist" and to physicians as "customers," PSSs do not sell AZ's products to physicians or to anyone else. Defendant has admitted "health care practitioners don't buy drugs from anyone directly. They don't supply drugs to patients through a prescription." The patient or consumer is the one who goes to the pharmacy to purchase and pay for the drug. The traditional "sale of cash exchanging and transfer of title taking place does not happen in the sale transaction that occurs with a PSSs

and a physician or a health care provider." "The health care practitioners don't buy drugs from anyone directly. They don't supply drugs to patients through a prescription." AZ does not record income when a health care provider promises to write or prescription or even when he or she writes a prescription for an AZ product, because the patient may not fill that prescription at all or may fill it with a non-AZ product. Rather, the purchase occurs when "[w]holesalers buy the AstraZeneca products and consumers purchase through a prescription at the retail level pharmacy the AstraZeneca product. When they do that, it creates the demand for the wholesaler, which then triggers the sale by AstraZeneca." Indeed, AZ has stated that it considers the detailing work performed by PSSs to be promotional work. Ventura Dep. 69:9-19, 242:19-243:5, 372:7-19; Atha Dep. 23:17-24:1. AZB_C0002636; AZB_C0002650; AZB_C0002682; Ventura Dep. 156:17-157:24.

19. Likewise, Hummel's manager accompanied her on sales calls approximately every 3-4 weeks, and in connection with these "ride alongs" the manager prepared "field coaching forms" that contained the manager's evaluation of Hummel's selling skills, such as "sell to the need" and "close," as well as her activities and accomplishments in the field for that day. Appx., Tab 1, Hummel Tr., 278:5-17, 280:16-19, 281:3-15, 290:8-24; id., Tabs 3-4, 19, Field Coaching Forms. See also id., Tab 1, Hummel Tr., 287:4-288:5, 288:7-17, 291:3-292:20.

**RESPONSE NO. 19**

Undisputed that Plaintiff's managers accompanied her on "ride alongs" and that her managers prepared "field coaching forms." Plaintiff disputes that she sold anything, and refers the Court to response No. 18.

20. A portion of Hummel's compensation was tied to achievement of sales targets and product sales within her assigned geography. Appx., Tab 1, Hummel Tr., 175:6-9, 313:21-

314:23, 330:18-331:11, 332:6-10, 332:15-333:10, 341:11-14, 346:7-347:15; id., Tab 5, Email

dated October 27, 2003 from James Ader; id., Tab 6, Email dated July 4, 2001 from Andrew

Strow; id., Tab 7, Email Dated July 1, 2004 from Mark Ragone; id., Tab 11, Ventura Dec., ¶ 5.

**RESPONSE NO. 20**

Undisputed that part of Plaintiff's compensation was compromised of the Field Service

Incentive Plan that was purportedly connected to sales targets.  However, Plaintiff refers the

Court to Responses 17 and 18.

21.    Hummel was responsible for calling on numerous physicians in her territories,

and she considered such physicians to be her "clients."  Appx., Tab 1, Hummel Tr., 38:4-19.

**RESPONSE NO. 21**

Undisputed that Plaintiff referred to physicians as "clients."  However, Plaintiff did not

sell anything to physicians, and refers the Court to Responses 17 and 18.

22.    Hummel also understood that AstraZeneca wanted her to call on physicians and

others with prescribing authority because they had the authority to prescribe its products. Appx.,

Tab 1, Hummel Tr., 302:12-303:20.

**RESPONSE NO. 22**

Undisputed.  However, this understanding does not reflect that Plaintiff was engaged in

sales, and Plaintiff refers the Court to Responses 17 and 18.

23.    During her calls, Hummel engaged the doctors in persuasive dialogues designed

to increase the number of AstraZeneca prescriptions that they wrote for approved uses:

> I mean, the goal was -- is that to increase, you know,
> prescriptions.  Was a goal, is what we were told.  So this is
> what, you know, we want to do.  Go in, market, use the
> core selling method, talk to the physicians in hopes that that
> would deliver results.

Appx., Tab 1, Hummel Tr., 303:21-304:12; see also id., 31:5-21 (testifying that the purpose of making calls on doctors was to convince the doctor "to write [prescriptions for] the product, or products, that you were marketing").

**RESPONSE NO. 23**

Undisputed that Plaintiff described her job as a form of marketing of AZ products. Disputed that Defendant's citations to the record support this statement, as Plaintiff did not testify that she engaged in persuasive dialogues.

24.    Hummel admitted that she used the ISS model to acquire new business – i.e., new prescriptions — for AstraZeneca. Appx., Tab 1, Hummel Tr., 152:21-153:6.

**RESPONSE NO. 24**

Disputed.  Defendant's citations to the record do not support this statement.  Defendant also refers the Court to Responses 17 and 18.

25.    Hummel testified that her performance goals for 2001 included 32,736 prescriptions for Toprol XL and 41,135 prescriptions for Zestril/Zestoretic. Appx., Tab 1, Hummel Tr., 22:6-25:6, 26:2-27:19; Appx., Tab 8, 2001 Performance Plan, at 160267.

**RESPONSE NO. 25**

Undisputed that Tab 8 references performance goals and that Plaintiff had goals for prescriptions of her products.  Disputed that these goals indicate that Plaintiff engaged in sales, and Plaintiff refers to the Court to Responses 17 and 18.

B.    **Hummel Made Sales And Obtained Orders**

26.    Hummel admitted that her job was to sell.  In describing how her AstraZeneca experience helped her get a job at Novartis, Hummel stated: "I had been both in hospital selling as well as office selling, so they – they liked that." Appx., Tab 1, Hummel Tr., 49:2-25.  She

also stated that one of her job duties was working with other Sales Specialists "to coordinate selling efforts." Id., 197:25-198:6. She further testified that she "sold Seroquel." Id., 50:17.

**RESPONSE NO. 26**

Disputed that Plaintiff admitted that her job was to sell. Plaintiff also refers the Court to Responses 17 and 18.

27.    Hummel used a professional to draft a resume on her behalf. Appx., Tab 12, Resume; id., Tab 1, 33:14-34:23. Hummel testified in her deposition that she approved the resume, it was accurate (except for the title of her degree), and she intends to use it in future job searches. Id., Tab 1, Hummel Tr., 34:14-23, 35:4-36:5. In her resume, Hummel was described as a "Senior Sales Professional with extensive . . . experience in pharmaceutical sales; a results-driven producer adept at building and retaining client relationships [and] conducting in-depth sales presentations…" Appx., Tab 12, Resume; id., Tab 1, 33:14-34:23.

**RESPONSE NO. 27**

Undisputed that Plaintiff's resume contains the referenced language. Disputed that such language is an indication that Plaintiff engaged in sales, and Plaintiff refers the Court to Responses No. 17 and 18.

28.    Hummel's resume also stated that, among other products, she "sold Seroquel," and she "sold cardiovascular pharmaceuticals (Crestor) to physicians, cardiologists and hospitals." Appx., Tab 12, Resume; id., Tab 1, Hummel Tr., 33:14-34:23, 35:4-36:5.

**RESPONSE NO. 28**

Undisputed that Plaintiff's resume contains the referenced language. Disputed that such language is an indication that Plaintiff engaged in sales, and Plaintiff refers the Court to Responses No. 17 and 18.

29.    Hummel wrote in an email that she was "taking a promotion in the Long Term Care division-selling Nexium and Seroquel." Appx., Tab 20, Email dated October 18, 2002 from Hummel to Carianne Fugich; see also id., Tab 1, Hummel Tr., 313:8-11, 317:8-24.

**RESPONSE NO. 29**

Undisputed that the referenced language appears in Plaintiff's e-mail of October 18, 2002. Disputed that such is an indication that Plaintiff engaged in sales, and Plaintiff refers the Court to Responses No. 17 and 18.

30.    One of Hummel's initiatives that she admitted executing in her 2004 Personal Scorecard was to "continue to ask for business on every call/interaction." Appx., Tab 9, 2004 Personal Scorecard, at 143838; see also id., Tab 1, Hummel Tr., 126:8-24, 127:12-24, 130:4-6. Hummel also admitted that her manager expected her to "close" (i.e. ask for a commitment) at the conclusion of the calls that she made. Id., Tab 1, Hummel Tr., 313:4-7, 315:17-316:3, 317:2-7; id., Tab 10, Email dated June 22, 2005 from Brian Heffernan to Hummel; see also id., Tab 15, Presentation on ISS model at AZB_C0003578, 3671-72, 3679; id., Tab 1, Hummel Tr., 96:12-97:5, 97:6-10, 290:5-24.

**RESPONSE NO. 30**

Undisputed that the referenced language concerning Plaintiff's initiatives, which her district manager helped her develop (Def. Tab 1 at 127: 19-21), appears in Plaintiff's Personal Scorecard.

During all "sales" calls, Plaintiff and other PSSs were required to include a direct request from a PSS for the appropriate action from the customer. PSSs were supposed to ask doctors to perform some action in the future, including a request to prescribe an AZ product to appropriate patients. AZ refers to this as getting a "commitment" or a "close." However, doctors do not

commit to prescribe a certain number of prescriptions nor do they commit to prescribe a certain drug for a specific patient. A "commitment" is wholly nonbinding; the doctor is still free to not prescribe the AZ drugs. In fact, it would not have been ethical for a doctor to make a guarantee that he would prescribe the products to patients in the future. Def. Tab 1 at 289:15-290:4(getting a commitment "does not mean anything" because a PSS never knows that a physician will do); AZC0002998; AZB_C0001474; Ventura Dep. 75:7-13, 77:8-79:4, 158:9-15, 316:12-13; Atha Dep. 59:3-29.

31.    Hummel understood her role was to increase market share for AstraZeneca's products. Hummel was proud of herself when her manager congratulated her for an increase in market share. Appx., Tab 1, Hummel Tr., 313:4-7, 315:17-316:25; id., Tab 10, Email dated June 22, 2005 from Brian Heffernan to Hummel. Furthermore, one of Hummel's initiatives that she admitted executing in her 2004 Personal Scorecard was "…achieving Seroquel market share growth…." Id., Tab 9, 2004 Personal Scorecard, at 143837; see also id., Tab 1, Hummel Tr., 126:8-24, 127:12-24, 130:4-6.

**RESPONSE NO. 31**

Undisputed that Plaintiff testified that she was proud when her manager congratulated her. Disputed that the citations to the record indicate that Plaintiff engaged in sales, and Plaintiff refers the Court to Response No. 17, 18, and 30.

32.    Hummel "demonstrate[d] a good understanding of the ISS selling model" and used it to acquire new business. Appx., Tab 18, Career Ladder Self Evaluation, at 143640; id., Tab 1, Hummel Tr., 148:21-150:2, 150:22-151:10.

**RESPONSE NO. 32**

Disputed that Defendant's citations to the record support this statement. Plaintiff also refers the Court to Response No. 17, 18, and 30.

### C.    Hummel Spent Almost All Of Her Work Time Traveling To And Selling At Physician's Offices

33.    Hummel spent the vast majority of her working time in the field making calls to doctors in her territory. Appx., Tab 1, Hummel Tr., 176:15-23. In making these calls, Hummel was almost wholly free of direct supervision -- she worked in the field alone most of the time, and her manager accompanied her on "ride-alongs" only once every 3-4 weeks or once every month. Id., 79:10-13, 280:4-15, 278:9-17; see also, 279:8-280:3 (testifying that managers met her for programs about once every two months).

**RESPONSE NO. 33**

Undisputed that Plaintiff spent the vast majority of her time working in the filed making calls. Disputed that Plaintiff was almost wholly free of direct supervision.

34.    Hummel testified that she approximately worked between 8 and 12 hours per day (not including drive time to the first call and back from the last call in the field). Appx., Tab 1, Hummel Tr., 228:2-23; 245:13-21; 246:11-15; 247:5-7.

**RESPONSE NO. 34**

Undisputed that Plaintiff worked more than 8 hours per day. Tab. 1 at 343:5-24; Hummel Decl. at ____.

### III.    Hummel Qualified for the Administrative Exemption

### A.    Hummel Meets The Salary Test

35.    Hummel earned an annual base salary of $50,158 effective November 1, 2001; $52,164 effective March 1, 2002; $54,251 effective September 1, 2002; $55,878 effective

November 1, 2002; $56,996 effective March 1, 2003; $61,342 effective September 1, 2003;

$63,796 effective March 1,2004; and $68,000 effective August 1, 2004 through Hummel's

termination of employment on or about October 15, 2005.  Appx., Tab 11, Ventura Dec., ¶ 5.

**RESPONSE NO. 35**

    Undisputed.

    **B.    Hummel's Primary Duty Was Management or General Business Operations**

    36.    Hummel testified that she spent the vast majority of her time as a PSS calling on

physicians.  Appx., Tab 1, Hummel Tr., 176:15-23.

**RESPONSE NO. 36**

    Undisputed that Plaintiff testified as such. However, AZ strictly controlled all aspects of

PSS calls upon physicians.  They were provided a four-week routing plan for the frequency of

times, they should call upon a doctor.  PSSs also were required to visit a set number of doctors

per day.  Once they met with the doctor, they had, Defendant told PSSs the message they were to

convey to the doctors as well as the order in which the message should be presented.  AZ

provided PSSs -- including Plaintiff -- scripts of what they should say during their sales calls.

PSSs were required to stay within the scripted company message and only present information

provided to them by AZ.  Each and every piece of printed or written materials (*e.g.* clinical

studies) PSSs utilized or provided to doctors had to have been pre-approved and supplied by AZ.

PSSs are required to offer the doctor a copy of the product insert and cannot present statements

out of context from the full prescribing information or approved promotional materials.  After a

"sales" call is completed, all PSSs are required to immediately enter call notes into their

computer.  The computer entry indicates the PSS who made the entry, the doctor seen by the

PSS, call notes from the call, and the time and date of the entry.  Atha Dep. at 83:20-84:2, 90:3-

21, 90:22-91:13, 140:11-19, 144:12-18; Ventura Dep. 103:10-105:2, 114:2-5; 118:9-119:21, 122:1-16, 242:13-245:13; AZB_C0000826; AZB _C0000828; AZ_C0003628; AZ_C0003629; AZB_C0038288.

37.    Hummel testified that she was successful in promoting Atacand in her district. Appx., Tab 1, Hummel Tr., 54:10-15.

**RESPONSE NO. 37**

Undisputed that Plaintiff testified as such.

38.    Hummel testified that AstraZeneca's "marketing materials used promotional terminology." Appx., Tab 1, Hummel Tr., 367:9-16.

**RESPONSE NO. 38**

Undisputed that the quoted language appears in Plaintiff's deposition transcript.

39.    Hummel wrote in the "Initiatives" section of her 2004 Personal Scorecard that she would "[c]ontinue to promote Nexium…." Appx., Tab 1, Hummel Tr., 126:8-24, 127:12-24; id., Tab 9, 2004 Personal Scorecard, at 000143836. Hummel testified that she actually executed the initiatives that she wrote in her 2004 Personal Scorecard. Id., Tab 1, Hummel Tr., 130:4-6.

**RESPONSE NO. 39**

Undisputed that the referenced language concerning Plaintiff's initiatives, which her district manager helped her develop (Def. Tab 1 at 127: 19-21), appears in Plaintiff's Personal Scorecard.

40.    Hummel testified that she discussed the promotion of AstraZeneca products with pharmacists. Appx., Tab 1, Hummel Tr., 241:7-10.

**RESPONSE NO. 40**

Undisputed that the above testimony appears in Plaintiff's deposition transcript.  ??

41.    Hummel admitted that her financial objective in her 2002 Performance Evaluation was to achieve total prescription goals for her "promoted Cardiovascular products." Appx., Tab 1, Hummel Tr., 121:10-122:17; Tab 2, 2002 Performance Evaluation, at 000139840.

**RESPONSE NO. 41**

Undisputed that the quoted language appears in Plaintiff's deposition transcript. However, prescription and market share increases in a particular territory do not correlate with the efforts of the individual PSS. Rather, many elements influence whether a doctor prescribes a drug, including, television and print advertisement, and the rep is merely one of those elements. Many factors impact the number of prescriptions filled in a PSS's territory, including: visits by PSSs (multiple PSSs will call on the same doctors to promote the same product), medical education events and conventions, patient requests, television commercials, newspaper advertisements, radio advertisements, and recommendations from other physicians. AZ invests millions of dollars in print and media advertisement to promote market expansion for its drugs. Almost one third (32%) of Americans have talked to a doctor about a drug as a result of seeing a drug advertisement; in approximately half (44%) of the cases, the doctor wrote a prescription for the requested drug. Finally, some products do better in the market simply because of the nature of the market (regardless of what the PSS does). Atha dep 36:24-37:5; Ventura Dep. 395:9-11, 400:13-401:19, 406:2-408:10; USA Today Article pp. 4, 19; *Pa. Emples. Benefit Trust Fund v. Zeneca, Inc.*, 499 F.3d 239, 245 (3rd Cir. 2007)

42.    In describing her job duties, Hummel testified "I marketed to physicians." Appx., Tab 1, Hummel Tr., 359:15-16.

**RESPONSE NO. 42**

Undisputed that the quoted language appears in Plaintiff's deposition.

### C.    Hummel's Primary Duty Included The Exercise Of Discretion And Independent Judgment

43.    Hummel admitted that during a sales call, she would uncover the physician's need and work that need into the product discussion so that the doctor would write more prescriptions. Appx., Tab 1, Hummel Tr., 257:24-258:11.

## RESPONSE NO. 43

Undisputed that Plaintiff testified as such at her deposition.  However, Plaintiff disputes that she exercised discretion and independent judgment, because she was required to stay "on label" and could only use AZ approved materials.  Def. Tab 1 at 259:2-6.  Plaintiff was also required to follow AZ's interactive selling process, and AZ provided Plaintiff with questions, probing statements, and answers to objections to use on "sales" calls.  *Id.* at 259:7-260:12. Plaintiff also refers the Court to Response No. 13.

44.    Hummel conceded that doctors reacted differently to sales calls and that their interests varied.  Appx., Tab 1, Hummel Tr., 257:8-22, 258:21-25.  Some doctors would spend more time with her, and others would "just have questions." Id., 257:19-22.

## RESPONE NO. 44

Undisputed that Plaintiff testified as such at her deposition.  Plaintiff disputes that this testimony indicates she exercised independent judgment and discretion, and refers the Court to Response No. 13 and 43.

45.    Hummel admitted that there are various ways to present information during a sales call and there are several different topics that a Sales Specialist could cover with a doctor who is an expert.  Appx., Tab 1, Hummel Tr., 260:4-18, 357:4-7.

**RESPONSE NO. 45**

Disputed that the citations to the record support this statement.  Plaintiff also refers the Court to Response No. 13 and 43.

46.     Hummel testified that doctors would ask questions that were not covered in AstraZeneca training.  Appx., Tab 1, Hummel Tr., 354:3-9.

**RESPONSE NO. 46**

Undisputed the Plaintiff testified as such at her deposition, but there is no citation to the record indicating that Plaintiff could answer such questions.

47.     Hummel testified that she would do pre-call planning 1-2 times a day.  Appx., Tab 1, Hummel Tr., 247:24-248:4.  In creating her plan, she would review the names of people in the office who had influence.  See id., at 248:7-22.  She would sometimes review the doctor's prescribing history.  See id., 248:23-249:9.

**RESPONSE NO. 47**

Undisputed that Plaintiff testified as such during her deposition.  Plaintiff disputes that pre-call planning indicates that she exercised independent judgment and discretion, as AZ required her to do so as part of the interactive selling process.  Plaintiff also refers the Court to Response No. 13 and 43.

48.     During her pre-call planning, Hummel would also prepare an opening message and select the marketing materials she wanted to use in her sales call.  Appx., Tab 1, Hummel Tr., 252:6-17.  Hummel admitted that the materials she used and the opening messages would differ from call to call.  Id., at 253:1-10.  Indeed, Hummel testified:

> Q.  Okay.  And so based on what you did have -- I mean, what
> came out at the end of the pre-call planning?  Did you have a game
> plan to go into the office?

A.  Yeah.  You would have a -- you know, an opening statement that you wanted to make, and how you wanted to bridge into the marketing piece, maybe what -- what page you wanted to use in the marketing piece, because if you only have 30 seconds, a lot of times you can just cover – you couldn't go through the entire piece, because it's page by page.

So you might think about, you know, I'm just going to use this page today.  And so you'd know that before you went in.  You might have an opportunity to do it, you might not.

Q.  You would have to make some call as to what would be the most effective page to use.  Is that right?

A.  Yes.  It may just be the call message.

Q.  That may be it.

A.  Yes.

Q.  Maybe something else.

A.  Correct.

Q.  Okay.  Did all your pre-call plans end up with the same result? I mean, you did the same thing every time, same page of the CVA every time?

A.  Did I use the same page every time?

Q.  Right.

A.  No.

Q.  And did you have the same opening statement every time?

A.  No.

Id., 252:2-253:10.

## RESPONSE NO. 48

Undisputed that the quoted testimony appears on the referenced pages.  However, Plaintiff disputes that this testimony indicates that she exercised discretion and independent judgment, and refers the Court to Response No. 13 and 43.

49.    Hummel testified that she would sometimes review a physician's prescribing history but she often found that some of the data provided by AstraZeneca was not specific enough to be useful for the cultivation of her local market. Appx., Tab 1, Hummel Tr., 20:16-21:3. She further testified that to overcome this limitation, she would have to come up with information herself in order to figure out what to do. Id., 21:19-25. Indeed, she stated: "You know, you had to kind of put it all -- a little bit of each piece together and draw your own conclusion." Id., 21:8-11.

**RESPONSE NO. 49**

Disputed that the citation to the record supports this statement. Plaintiff testified that the information concerning prescribing history was provided to her be AZ. Def. Tab. 1 at 21:12-17.

50.    Hummel also testified that she managed a budget for programs she conducted. See Appx., Tab 1, Hummel Tr., 297:2-21. AstraZeneca did not direct her to spend a certain amount of money on a particular physician. Id., 297:9-13. Hummel testified that she and her manager would approve the expenditures that she thought were appropriate. Id., 297:18-21; see also id., 145:13-21.

**RESPONSE NO. 50**

Undisputed that Plaintiff, with assistance and approval from her manager, managed a budget for programs.

51.    Hummel has described her use of discretion and independent judgment on various occasions. In her Career Ladder Self Evaluation, which she completed and submitted in seeking a promotion (and which she wrote in the third person), she wrote, among other things, that she:

- has used her budget to capitalize on establishing herself in her new territory. She has used regional meetings to interact with her counterparts and gain insight on the territory and on customers, which they share as well as

getting together on a regular basis to discuss the territory. She has established relationships with people in departments who have access to information and can be used as resources…

- is successful in handling both routine and new situations on her own.  She recognizes the impact of actions and takes appropriate steps to solve the problem.

- is very cognizant of when to be more/less aggressive when selling to physicians.

- gains knowledge of disease states and related products through self-study.  This was evident with her promotion to LTC and her learning Seroquel and Nexium.

- …has focused on doctors that have an immediate and dramatic impact on the business.

- continues to gain access in key accounts by establishing long term relationships, doing lunch/learns and thinking outside of the box, in turn setting herself apart…Holly follows her own judgment in the face of opposition.…

- developed strategies to penetrate her significant accounts. This is evidenced in her business action plans.  She proactively addresses obstacles that may impede account progress…

- has met and developed a business plan with all of her counterparts (CNS and Hospital) that incorporate short-term goals and long-term business objectives.  She understands the different associations to which LTC could benefit and their impact on physicians and other key customers.  She has participated in association meetings, such as NYASCAP to help build relationships.

Appx., Tab 18, Career Ladder Self Evaluation, at 000143640-641; id., Tab 1, Hummel Tr.

148:21-150:9, 150:22-151:10.

## RESPONSE NO. 51

Undisputed that the self-promotional language appears in the referenced exhibit.  Plaintiff

disputes that this language indicates that she exercised discretion and independent judgment, and

refers the Court to Response No. 13 and 43.

52.    In her resume, which she wrote, Hummel described herself as a "highly motivated, resourceful, and high energy Pharmaceutical Sales Professional with progressive management, administrative and troubleshooting experience within intensive customer service environment." Appx., Tab 21, 2002 Resume; see also id., Tab 1, Hummel Tr., 36:8-21, 37:4-38:3.  She further stated that she is a "tenacious problem solver who ascertains needs and goals, identifies difficulties and formulates and implements strategic solutions to increase effectiveness and productivity within budgets and time frames." Id., Tab 21, 2002 Resume.  Hummel testified that the resume was accurate. Id., Tab 1, Hummel Tr. 37:23-38:3.

**RESPONSE NO. 52**

Undisputed that the quoted self-promotional language appears in the referenced exhibit. Plaintiff disputes that the referenced language indicates that she exercised discretion and independent judgment, as Plaintiff testified that she used the referenced language because that is the language used within the industry.  Def. Tab 1 at 359:8-360:14.

53.    In her resume, which she wrote, Hummel described her Sales Specialist job duties as the following:

> Organize, coordinate, and assume authority for daily activities, functions, and decisions; set priorities activate methodologies, and create plans for workflow and distribution.  Utilize extensive leadership abilities to administer and promote company policies and procedures to attain specific organizational goals.  Maintain open channels of communication to result in optimum delivery of service in an environment that fosters self-motivation, team concepts and responsible business development.  Monitor operating budgets and direct the utilization of resources to effectively accomplish goals with the budgeted framework. Interact and consult with clients: assess and analyze specific situations and individual needs to move business.  Establish procedures for excellent customer service including fielding, investigation, and resolving complaints and issues in a timely manner to preserve positive alliances.

Appx., Tab 21, 2002 Resume; see also id., Tab 1, Hummel Tr., 36:8-21, 37:4-38:3.

**RESPONSE NO. 53**

Undisputed that the quoted self-promotional language appears in the referenced exhibit. Plaintiff disputes that the referenced language indicates that she exercised discretion and independent judgment, and refers the Court to Response No. 52.

54.     In her 2004 Personal Scorecard, Hummel wrote that her initiatives would be to, among other things:

- Analyze data on a regular basis from CNS counterparts, early view and pharmacy providers

- Leverage deployed resources (CSM, MIS) and valued added resources (NQL, vouchers, etc.) to access difficult customers and drive share

- Team with pharmacy providers and counterparts to identify key prescribers, influencers and consultants

- Ensure development and execution of precall analysis, critical information seeking and strategic influencing

- [Participate in] cylinder meetings to plan, target and address business ongoings with pod members

- Meet[] with LTC counterparts to plan business strategies within our overlapping targets

- Enhance clinical knowledge by keeping abreast with journals and new information related to disease states

- ...start researching best possible ways to influence business at Group homes and Adult homes;

- ...attend pharmacy provider preceptorship if offered again

Appx., Tab 9, 2004 Personal Scorecard, at 000134836-839; see also id., Tab 1, Hummel Tr., at 126:8-24, 127:12-24.  Hummel admitted that she actually executed these initiatives.  Id., Tab 1, Hummel Tr., 130:4-6.

**RESPONSE NO. 54**

Undisputed that the quoted language appears in the referenced exhibit. Plaintiff disputes that the referenced language indicates that she exercised independent judgment and discretion, and refers the Court to Response No. 13 and 43.

55.     Hummel used a professional to draft a resume on her behalf. Appx., Tab 12, Resume; id., Tab 1, 33:14-34:23. Hummel testified in her deposition that she approved the resume, it was accurate (except for the title of her degree), and she intends to use it in future job searches. Id., Tab 1, Hummel Tr., 34:14-23, 35:4-36:5. In her resume, Hummel was described as a "Senior Sales Professional . . . [adept at] efficiently managing a territory and ensuring bottom-line profitability." Appx., Tab 12, Resume; id., Tab 1, Hummel Tr., 33:14-36:5. It further stated that, while working for AstraZeneca, Hummel "[p]repared detailed business plans of action designed to increase market share" and that she "[m]anaged and built the Westchester territory." Id., Tab 12, Resume.

**RESPONSE NO. 55**

Undisputed that the quoted self-promoting language appears in the referenced exhibit. Plaintiff disputes that this language indicates that she exercised discretion and independent judgment, and refers the Court to Response No. 52.

56.     When applying for the long term care Sales Specialist position, Hummel described herself as a "quick learner and a good strategic thinker who can digest complex information and build a coherent actionable structure from it. I am also very good at sensing opportunities and creating ways to capitalize on them." Appx., Tab 22, Email dated October 15, 2002 from Hummel to George Venidis; id., Tab 1, Hummel Tr., 109:4-20, 116:23-117:4.

**RESPONSE NO. 56**

Undisputed that the quoted self-promotional language appears in the referenced exhibit.

57.     Hummel's manager accompanied her on sales calls approximately every 3-4 weeks, and in connection with these "ride alongs" the manager prepared "field coaching forms" that contained the manager's evaluation of Hummel's selling skills, activities and accomplishments in the field for that day. Appx., Tab 1, Hummel Tr., 278:9-17, 280:16-23. On one such field coaching form, her manager wrote that Hummel "puts considerable thought into selecting the appropriate message, preparing the sales dialogue, and selecting the supporting materials." Appx., Tab 19, March 2000 Field Coaching Form, at 167685; see also id., Tab 1, Hummel Tr., 287:4-288:5.

**RESPONSE NO. 57**

Undisputed that the quoted language appears in the referenced exhibit, which is from 2000 and not part of the potential class period in this action. Plaintiff disputes that the referenced language indicates that Plaintiff exercised discretion and independent judgment, and refers the Court to Response No. 13 and 43.

58.     Hummel testified that on most days, she performed her work without management personnel observing her. Appx., Tab 1, Hummel Tr., 79:10-13, 280:4-15. She stated that she was accompanied by management in a ride-along about once every 3-4 weeks or every month. Id., 278:9-17. Other than ride-alongs, her supervisors did not accompany her in the field unless they met her at a program, which occurred once every two months. Id., 279:8-280:3.

**RESPONSE NO. 58**

Undisputed that Plaintiff testified as such at her deposition. However, Plaintiff disputes that the referenced testimony indicates that she exercised discretion and independent judgment, as her managers supervised her in the field by reviewing her call notes, through voice mail, and email. Hummel Decl. at ____.

59.    Hummel used the ISS model in her daily activities as a Sales Specialist. Appx., Tab 1, Hummel Tr., 96:16-97:10, 98:5-15. The ISS model called for a "dialogue, not only a presentation", and encouraged PSS's to engage in a "dynamic dialogue" that involved a "complex thinking process" by the PSS. Id., Tab 15, ISS Presentation - 2004, at AZB_C0003574, 3589-90, 3615; see also id., Tab 1, Hummel Tr., 96:16-97:10.

**RESPONSE NO. 59**

Undisputed that AZ required Plaintiff to use the ISS model. Def. Tab 1 at 97:6-10; 98:7-13. Plaintiff disputes that use of the ISS model indicates that she exercised discretion and independent judgment, and refers the Court to Response No. 17 and 18.

**IV.    Termination of Hummel's Employment**

60.    Hummel's employment with AstraZeneca ended on October 14, 2005. Appx., Tab 1, Hummel Tr., 11:4-7.

**RESPONE NO. 60**

Undisputed.

61.    On November 17, 2005, Hummel, in exchange for a cash payment of more than $13,000 and other settlement benefits, executed a Mutual Consent Release Agreement. Appx., Tab 1, Hummel Tr. 189:2-18, 190:14-21; id., Tab 23, Release.

**RESPONSE NO. 61**

Undisputed.

62.    The release signed by Hummel specifically waived <u>any</u> state law claims pertaining to Hummel's employment that arose prior to the effective date of the Release. Specifically, it waived:

> [A]ny and all … causes of actions, suits, debts, claims and demands . . . which [Hummel] ever had, now has, or hereafter may have . . . . by reason of any matter, cause or thing whatsoever which has occurred in the past up to the date of execution of this Agreement and, particularly, but without limitation of the foregoing general terms, any federal, state, or local claims arising from or relating in any way to [Hummel's] employment relationship or the termination of [Hummel's] employment relationship with [AstraZeneca].

Appx., Tab 23, Release, ¶ 3; <u>see also</u> <u>id.</u>, Tab 1, Hummel Tr., 189:2-18.

**RESPONSE NO. 62**

Disputed that the citations to the record support this statement.

63.    Hummel certified that she "carefully read the terms of this Release …, that [she] underst[ood] them, and that [she] voluntarily enter[ed] into the Release with the intention of releasing all claims…." Appx., Tab 23, Release, ¶ 6; <u>id.</u>, Tab 1, Hummel Tr., 189:2-18. Hummel also testified that she had the opportunity to and did in fact review the Release. Appx., Tab 1, Hummel Tr., 190:22-191:3.

**RESPONSE NO. 63**

Undisputed.

64.    Hummel was provided a period of 21 calendar days within which to consider whether to sign the Release, and was afforded the right to revoke the Release within seven days of signing the Release. Appx., Tab 23, Release, ¶ 8. Hummel testified that she signed the Release and did not revoke it. <u>Id.</u>, 189:2-18, 191:4-6.

**RESPONSE NO. 64**

Undisputed.

65.    AstraZeneca also "advised [Hummel] to consult with an attorney prior to executing the Release." Appx., Tab 23, Release, ¶ 15; id., Tab 1, Hummel Tr., 189:2-18. Hummel was in fact represented by an experienced New York employment attorney in negotiating the Release with AstraZeneca. Id., 185:21-186:7.

**RESPONSE NO. 65**

Disputed that the citations to the record support this statement.  Furthermore, Plaintiff testified that she could not recall if she consulted with an attorney prior to signing the release. (Def. Tab 1 at 189:19-190:7)


Dated:  New York, New York          Respectfully submitted,
        July 14, 2008

                                   JOSEPH & HERZFELD, LLP


                                   By:  __/s/ Michael R. DiChiara_____
                                        Michael R. DiChiara
                                        757 Third Avenue, Suite 2500
                                        New York, NY  10017
                                        Tel. (212) 688-5640
                                        Fax (212) 688-2548

                                   *Attorneys for Plaintiff*