UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ x

HOLLY MARIE HUMMEL, on behalf of   )    No. 07 CIV 5473 (VM)
herself and others similarly situated,   )
                                  )    DECLARATION OF HARRY JOHNSON
         Plaintiff,       )    IN SUPPORT OF DEFENDANT'S
                                  )    MOTION FOR SUMMARY JUDGMENT
        -against-       )
                                  )    Judge:     Victor Marrero
ASTRAZENECA LP,             )
                                  )
         Defendant.     )
                                  )

------------------------------------------------------ x

I, Harry Johnson, state as follows:

    1.    I am a partner with the law firm of Jones Day, counsel of record for Defendant

AstraZeneca LP ("AstraZeneca"). I make this declaration in support of Defendant's Motion for

Summary Judgment. This declaration is based on my personal knowledge and, if called by a

court of law, I could and would competently testify to the facts set forth herein.

    2.    Attached hereto as Exhibit A is a true and correct copy of the Errata Sheet to

Debra Ventura's deposition transcript.

    3.    Attached hereto as Exhibit B is a true and correct copy of the decision of the U.S.

District Court for the Central District of California in Brody v. AstraZeneca Pharm. LP, Case

No. CV 06-6862 ABC (MANx), slip op. (C.D. Cal. June 11, 2008) (appeal pending).

    4.    Counsel between the parties in the instant matter do not have any "general

purpose" type of agreement allowing all discovery exchanged in any other cases instituted

against AstraZeneca to be used in this lawsuit by Holly Hummel ("Hummel"). Rather, Counsel

have agreed only that Hummel can use in her lawsuit (a) any documents produced by

AstraZeneca to Timothy Carson in his lawsuit against AstraZeneca, entitled Carson v.

AstraZeneca, Case No. 07-359 MPT (D. Del.), subject to the protective order which was in place in that matter, and (b) any deposition testimony taken of AstraZeneca representatives pursuant to Federal Rules of Civil Procedure 30(b)(6), subject to the stipulation entered in the Brody matter concerning such testimony.  As noted above, the Brody decision is on appeal to Ninth Circuit; Carson was dismissed by the plaintiff in that case voluntarily, with prejudice, on January 4, 2008.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August ___, 2008 in Los Angeles, California

_____
Harry Johnson

# EXHIBIT A

Confidential - Debra Martin Ventura

Page 455

1             ACKNOWLEDGEMENT OF DEPONENT

2        I, _Debra M. Ventura_ _ _, do

3    hereby certify that I have read the

4    foregoing pages, _1 - 457_ _, and that

5    the same is a correct transcription of

6    the answers given by me to the questions

7    therein propounded, except for the

8    corrections or changes in form or

9    substance, if any, noted in the attached

10   Errata Sheet.

11   _ _ _2/8/08_ _ _ _ _ _ _ _ _ _ _ _ _ _

12   DATE

13

14   Subscribed and sworn to before me this

15   _ _8_ _ day of _February_ _ _,

16   2008.

17   My commission expires: _2|8|08_ _ _ _

18

19   _Katina Select_

20

21   Notary Public

22

23

24

# ERRATA SHEET

## DEBRA VENTURA  DEPOSITION TRANSCRIPT

| Page | Line | Change/Reason |
|------|------|---------------|
| 78 | 7 | **Change**: "Correct" to "Correct, except that sometimes a PSS will ask for and obtain a commitment to prescribe a product regarding the next group of an appropriate type of patient that the prescriber will treat, like the next one or five or ten patients out of that type." |
| | | **Reason**: Accuracy |
| 121 | 2-5 | **Change**: *Add the underlined words*: "If it's a separate and distinct and unique conversation and if they're having a sales conversation about approved AstraZeneca brands, yes." |
| | | **Reason**: Accuracy |
| 316 | 12-13 | **Change**: *After* "The PSS does not get a commitment to purchase" *insert* "in the sense of how you described the commitment in your earlier description of a transaction to buy on page 74 lines 8-13. As I testified earlier, the PSS does attempt to get a commitment to prescribe for an appropriate patient type." |
| | | **Reason**: Accuracy |
| 321 | 11 | **Change**: "P-A-L-C-Z-U-H" to "P-A-L-C-Z-U-K" |
| | | **Reason**: Accuracy |

# Exhibit B

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MARC BRODY, on behalf of himself
and others similarly situated,

                    Plaintiffs,

          v.

ASTRAZENECA PHARMACEUTICALS, LP,
et al.,

                    Defendants.

CV 06-6862 ABC (MANx)

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

     Pending before the Court is Defendant AstraZeneca

Pharmaceuticals, LP's ("Defendant") Motion for Summary Judgment

("Motion"), filed on April 21, 2008.  Plaintiff Marc Brody

("Plaintiff") filed an Opposition[1], and Defendant filed a Reply.  The

Court finds the Motion appropriate for resolution without oral

argument, and **VACATES** the hearing set for June 16, 2008.  See Fed. R.

_____

     [1]  The Court GRANTS Plaintiff relief from the slightly late
filing of his Opposition.  However, the Court admonishes Plaintiff for
his use of numerous lengthy footnotes that violate Local Rule 11-3.1.1
(pertaining to typeface), and that appear designed to evade Local Rule
11-6 (establishing page limits for memoranda).

Civ. P. 78; Local Rule 7-15.  Upon consideration of the materials submitted by the parties and the case file, the Court hereby **GRANTS** the Motion.

## I.  **FACTUAL AND PROCEDURAL BACKGROUND**

In this action, Plaintiff Marc Brody asserts various claims under California law for overtime and for missed meal and rest breaks against his former employer Defendant AstraZeneca Pharmaceuticals.[2] It is undisputed that all of these claims turn on whether Defendant properly classified Plaintiff as "exempt" under California law. Defendant contends that the undisputed facts establish that Plaintiff was an "outside salesperson," a category of employee exempt from the overtime laws under Cal. Labor Code § 1171, and that Plaintiff is therefore not entitled to any of the relief he seeks.  Plaintiff opposes, contending that his work did not involve "selling"; instead, it was more in the nature of promotion work.

In wage cases alleging unpaid overtime, how an employee spent his or her working time is a question of fact, and the determination of whether an employee's duties and activities qualify as "exempt" is a question of law.  Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 714 (1986).  In this case, although some facts are disputed, there are sufficient undisputed facts upon which the Court can determine as a matter of law whether Plaintiff was an "outside salesperson" and therefore exempt.

//

---

[2]  Plaintiff dismissed his first claim for relief under the federal Fair Labor Standards Act.  His remaining eight claims are based on the California Labor Code (second through seventh, and ninth, claims), and California's Unfair Competition Law (eighth claim).

1  Several courts in the Central District of California have
2  addressed this same issue in cases factually indistinguishable from
3  the instant case.  See Menes v. Roche Labs Inc., 2008 U.S. Dist. LEXIS
4  4230 (C.D. Cal. Jan 7, 2008) (appeal pending); Barnick v. Wyeth, 522
5  F. Supp. 2d 1257 (C.D. Cal. 2007) (appeal pending); D'Este v. Bayer
6  Corp., 2007 U.S. Dist. LEXIS 87229 (C.D. Cal. Oct. 9, 2007) (appeal
7  pending).  In each of these cases, the plaintiff was a product
8  representative for a pharmaceutical company and performed essentially
9  the same tasks with the same goals and similar training as Plaintiff
10  herein performed.  In each case, the court examined the plaintiff's
11  actual job duties and determined that he or she was an outside
12  salesperson within the meaning of California law, and therefore exempt
13  from overtime protections.  Having independently considered the issue
14  in this case, this Court reaches the same conclusion.

15                    **II.   LEGAL STANDARD**

16  Summary judgment "should be rendered if the pleadings, the
17  discovery and disclosure materials on file, and any affidavits show
18  that there is no genuine issue as to any material fact and that the
19  movant is entitled to a judgment as a matter of law." Fed. R. Civ. P.
20  56(c).  The moving party has the burden of demonstrating the absence
21  of a genuine issue of fact for trial.  Anderson v. Liberty Lobby,
22  Inc., 477 U.S. 242, 256 (1986).

23  Where the moving party bears the burden of persuasion at trial,
24  the moving party must show that no reasonable trier of fact could find
25  other than for the moving party.  William W. Schwarzer, et al.,
26  California Practice Guide: Federal Civil Procedure Before Trial §
27  14:124-127 (2001).  The moving party's burden extends to each element
28  of the claim or claims on which it seeks summary judgment or summary

1  adjudication. _S. Cal. Gas Co. v. City of Santa Ana_, 336 F.3d 885, 888

2  (9th Cir. 2003) ("As the party with the burden of persuasion at trial,

3  the [plaintiff] must establish 'beyond controversy every essential

4  element of its Contract Clause claim."); Schwarzer, California

5  Practice Guide: Federal Civil Procedure Before Trial § 14:124-127;

6  _Fontenot v. Upjohn Co._, 780 F.2d 1190, 1994 (5th Cir. 1986) ("If the

7  movant bears the burden of proof on an issue, either because he is the

8  plaintiff or as a defendant asserting an affirmative defense, he must

9  establish beyond peradventure _all_ of the essential elements of the

10 claim or defense to warrant judgment in his favor.") (emphasis in

11 original).

12     If, on the other hand, the non-moving party has the burden of

13 proof at trial, the moving party has no burden to negate the

14 opponent's claim. _Celotex Corp. v. Catrett_, 477 U.S. 317, 323 (1986).

15 The moving party does not have the burden to produce _any_ evidence

16 showing the absence of a genuine issue of material fact. _Id._ at 325.

17 "Instead, . . . the burden on the moving party may be discharged by

18 'showing' - that is, pointing out to the district court - that there

19 is an absence of evidence to support the nonmoving party's case." _Id._

20 (citations omitted).

21     Once the moving party satisfies its initial burden, "an adverse

22 party may not rest upon the mere allegations or denials of the adverse

23 party's pleadings . . . [T]he adverse party's response . . . must set

24 forth specific facts showing that there is a genuine issue for trial."

25 Fed. R. Civ. Pro. 56(e); _S. Cal. Gas Co._, 336 F.3d at 888 ("[The non-

26 moving party] can defeat summary judgment by demonstrating the

27 evidence, taken as a whole, could lead a rational trier of fact to

28 find in its favor.") (citations omitted). The evidence of the non-

1  movant is to be believed, and all justifiable inferences are to be

2  drawn in favor of the non-movant.  Anderson v. Liberty Lobby, Inc.,

3  477 U.S. 242, 255 (1986).  However, the court must view the evidence

4  presented "through the prism of the substantive evidentiary burden."

5  Id. at 254.

6      The "mere existence of some alleged factual dispute between the

7  parties will not defeat an otherwise properly supported summary

8  judgment motion; the requirement is that there be no genuine issue of

9  material fact."  Anderson, 477 U.S. at 247-48.  The "opponent must do

10 more than simply show there is some metaphysical doubt as to the

11 material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio

12 Corp., 475 U.S. 574, 586 (1986).

13     An issue of fact is a genuine issue if it reasonably can be

14 resolved in favor of either party.  Anderson, 477 U.S. at 250-51.

15 "[M]ere disagreement or the bald assertion that a genuine issue of

16 material fact exists" does not preclude summary judgment.  See Harper

17 v. Wallingford, 877 F.2d 728, 731 (9th Cir. 1989).  "The mere

18 existence of a scintilla of evidence in support of the [non-movant's]

19 position will be insufficient; there must be evidence on which the

20 jury . . . could find by a preponderance of the evidence that the

21 [non-movant] is entitled to a verdict . . . ."  Anderson, 477 U.S. at

22 252.  "Only disputes over facts that might affect the outcome of the

23 suit under the governing law will properly preclude the entry of

24 summary judgment."  Id. at 248.

25     "[A] district court is not entitled to weigh the evidence and

26 resolve disputed underlying factual issues."  Chevron Corp. v.

27 Pennzoil Co., 974 F.2d 1156, 1161 (9th Cir. 1992).  Rather, "the

28 inferences to be drawn from the underlying facts . . . must be viewed

1  in the light most favorable to the party opposing the motion."  United

2  States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

3                III.  UNDISPUTED FACTS

4      Plaintiff applied for a job with Defendant in 1992 seeking "a

5  position in Pharmaceutical Sales."  (Statement of Undisputed Facts

6  ("UF") 3.)  Plaintiff was hired in May 1992 as a pharmaceutical

7  specialist, and in 2000 or 2001, his title changed to Pharmaceutical

8  Sales Specialist ("PSS"), but his job duties remained the same.  (UF

9  4-5.)  In applying for employment, Plaintiff referred to himself as a

10  "Sales Representative" with "[e]xperience in Outside Sales."  (UF 22.)

11      The parties agree that Plaintiff's job required him, in basic

12  terms, to visit doctors in his assigned territory and discuss

13  Defendant's products with them, with the goal of inducing those

14  doctors to write more prescriptions for Defendant's products.  See,

15  e.g., UF 29-31; Pl.'s Opp'n at 13:5-8, stating "no one disputes that

16  [Plaintiff] provided physicians with information and attempted to

17  persuade them of the benefits of [Defendant's] products for the

18  patients in order to induce physicians to write more prescriptions for

19  [Defendant's] products."  This practice is known as "detailing."

20  (Pl.'s Statement of Disputed Facts ("Pl.'s DF") 22.)

21      At his deposition, Plaintiff testified that he used sales aids to

22  help "gain agreement" by the prescriber and "move [the prescriber] . .

23  . any step along the sales process."  (UF 18.)  Plaintiff also used a

24  "personal detail strategy" for the products Nexium and Toprol XL in

25  which he asked the physician, "What is the one thing I can tell you

26  that would get you to used more Nexium (Toprol XL)?"  (UF 37.)

27  Plaintiff's "personal detail strategy" for the Entocort product

28  concluded with "Ask M.D.s to use [Entocort] after course of Prednisone

1   [i.e. another drug]." (UF 38.) Plaintiff also "closed" physicians on

2   products by asking the physician if he could "ask for those patients,"

3   and the physician agreed. (UF 39.) Plaintiff also testified at his

4   deposition that the statement "I want you to write more Nexium [or

5   Toprol XL] for me" fit under his own definition of a "close." (UF

6   40.)

7       Plaintiff was 18 years of age or older during the entirety of his

8   employment with Defendant. (UF 20.) Plaintiff spent the majority of

9   his time in the field detailing Defendant's products to doctors and

10  other health care practitioners. (UF 21.) Plaintiff used a variety

11  of sales aids in performing his sales calls, including core visual

12  aids ("CVAs") and clinical studies, or reprints, which he used to

13  support his product discussions with physicians. (UF 17.) Plaintiff

14  described the PSS workforce as "a sales organization that has a vital

15  interest in the long term success of our customers" and referred to

16  himself as part of "the sales force." (UF 23.) Both Plaintiff and

17  Defendant considered physicians to be Defendant's "customers." (UF

18  33, 34; Pl.'s Response UF 23.)

19      Plaintiff received training for his work, including, for example,

20  on Defendant's so-called "Interactive Solution Selling" ("ISS") Model,

21  which involved "ask[ing] for [a] commitment" to prescribe Defendant's

22  products, having a dialogue with the physician, and "[i]dentify[ing]

23  prescribing behavior." (UF 42.) Plaintiff attended "didactic" (i.e.,

24  training) sessions about once every two to three months to practice

25  role-playing his calls on health care providers and to review clinical

26  studies. (UF 10.) Plaintiff also participated in developing an

27  "Advanced PSS Training" program designed to "increase our selling

28  skills, learn from each other, and share best practices." (UF 45.)

1    Plaintiff's job performance was evaluated in part on his ability
2    to achieve "positive changes . . . with market share." (UF 50.)
3    Plaintiff was evaluated in market share changes and activity on the
4    drugs he promoted. (UF 51.) Plaintiff recognized in 2004 that his
5    PSS group, the "Santa Barbara cylinder," would be measured on "market
6    share growth" which, according to him, was "MUCH BETTER" because the
7    cylinder had high rates of prescriptions. (UF 52.) Plaintiff also
8    stated to another cylinder representative that "the main thing is that
9    we are already driving share where we can and have great plans to do
10   more." (UF 52.) Plaintiff admitted that he was turned down for a
11   promotion two years in a row because the company believed he had a
12   "lack of consistency" in sales. (UF 54.) Plaintiff's performance
13   evaluations contained an assessment of Plaintiff's efforts to achieve
14   sales objectives. (UF 56.) Finally, Plaintiff earned incentive
15   compensation based in part on hitting sales targets and product sales
16   based on market share or total prescriptions and/or new prescriptions
17   within his assigned territory. (UF 57, 58.)

18   Plaintiff spent the overwhelming majority of his time in the
19   field, typically without any direct supervision. For example,
20   Plaintiff testified that his manager accompanied him in the field less
21   than once a month. (UF 62.) The frequency of field visits by his
22   manager was approximately once every six weeks for one manager, and
23   only three times per year with a subsequent manager. (UF 106.)

24   It is also undisputed, however, that Plaintiff's job did not
25   entail any direct transactions with physicians, that is, Plaintiff
26   never transferred products to physicians in exchange for
27   consideration. In Plaintiff's terms, he consummated no sales.
28   Rather, although Plaintiff discussed Defendant's products with

1  physicians with the goal of inducing them to write more prescriptions
2  and thereby increase sales of Defendant's products, other employees –
3  those in Defendant's Customer Relations and Services Group – were
4  responsible for consummating sales.  Furthermore, those sales were not
5  made to individual physicians, but to wholesalers who would then
6  typically re-sell the pharmaceuticals to pharmacies, from whom
7  individual consumers with prescriptions from their physicians would
8  ultimately purchase the pharmaceuticals.  See generally Pl.'s Facts
9  43, 51-62.

10                    **IV.  DISCUSSION**

11      Section 510 of the California Labor Code requires employers to
12  compensate non-exempt employees for time worked in excess of
13  statutorily-defined maximum hours.  See Cal. Labor Code § 510.
14  Section 1171 expressly excludes from the overtime requirements "any
15  individual employed as an outside salesman."  Cal. Labor Code § 1171.
16  The California Industrial Welfare Commission ("IWC"), the agency
17  charged with implementing Section 1171, has defined the term "outside
18  salesperson" as "any person, 18 years of age or over, who customarily
19  and regularly works more than half the working time away from the
20  employer's place of business selling tangible or intangible items or
21  obtaining orders or contracts for products, services or use of
22  facilities."  Wage Order 4-2001(2)(J), codified at 8 Cal. Code Regs.
23  11070; Ramirez v. Yosemite Water Co., Inc., 20 Cal. 4th 785 (1999).

24      It is undisputed that Plaintiff was over the age of 18 for the
25  duration of his employment with Defendant, and that he "customarily
26  and regularly work[ed] more than half the working time away from the
27  employer's place of business."  Plaintiff contends, however, that the
28  outside salesperson exemption is inapplicable to him because as a PSS,

9

1  he only provided doctors with information about Defendant's products
2  and did not actually "sell" anything to those doctors, that is, he
3  didn't consummate sales with doctors by exchanging goods for
4  consideration.
5      The Court disagrees with the narrow interpretation of "selling"
6  urged by Plaintiff. First, the Wage Order defines "outside
7  salesperson" to require merely "selling," not the much more specific
8  "consummation of sales" upon which Plaintiff's argument rests.
9  Second, the Court notes that neither the Labor Code nor the Wage Order
10  defines the term "sell." Third, although there are a number of
11  California cases applying other aspects of this exemption, there is a
12  dearth of California cases addressing what it means to "sell" within
13  the context of Section 1171.
14      In Ramirez, for example, the California Supreme Court provided
15  some guidance in applying the exemption. However, there, the Court
16  considered whether the employee, who both delivered and sold bottled
17  water, performed enough sales work to render him an outside
18  salesperson within the meaning of the statute, not whether some
19  portion of his work could be characterized as "selling" in the first
20  place. Thus, the Ramirez Court was concerned primarily with
21  quantifying the proportion of the employee's work that was sales work,
22  that is, with determining whether plaintiff's selling activities
23  comprised "more than half the working time away from the employer's
24  place of business." Accordingly, Ramirez is not directly on-point
25  with the instant case.[3] Nevertheless, a fair reading of that case
26  _____
27      [3] Because Ramirez addresses a completely different question than
    the question herein, the Court rejects Plaintiff's argument that
28  Ramirez establishes that the California Supreme Court would find that

1    teaches a broader lesson: that the Court must examine the specific

2    content of the employee's work and the employee's and employer's

3    expectations of what the position entails.  Ramirez, 20 Cal.4th 785,

4    802 (1999) (In determining whether an employee is an "outside

5    salesperson" within the meaning of the wage order, "the court should

6    consider, first and foremost, how the employee actually spends his or

7    her time. [T]he trial court should also consider whether the

8    employee's practice diverges from the employer's realistic

9    expectations, whether there was any concrete expression of employer

10   displeasure over an employee's substandard performance, and whether

11   these expressions were themselves realistic given the actual overall

12   requirements of the job.")

13        In addition, as the California Labor Code was modeled on the

14   federal Fair Labor Standards Act ("FLSA"), interpretation of the FLSA

15   has persuasive authority for this Court's interpretation of the

16   California Labor Code and its attendant regulations.  Monzon v.

17   Schaefer Ambulance Service, Inc., 224 Cal. App. 3d 16, 31 (1990)

18   ("California courts have recognized that California's wage laws are

19   patterned on federal statutes and that the authorities construing

20   those federal statutes provide persuasive guidance to state courts");

21   Nordquist v. McGraw-Hill Broadcasting Co., 32 Cal. App. 4th 555, 562

22   (1995) ("Because the California wage and hour laws are modeled to some

23   extent on federal laws, federal cases may provide persuasive

24   _____

25   PSSs who do not themselves consummate transactions do not "sell"
     within the meaning of the exemption.  Furthermore, Plaintiff's
26   argument that California labor law is always more protective than
     federal law is unpersuasive.  The Court's task is to consider and
27   apply the terms of Section 1171 and Wage Order 4-2001(2)(J); broad
     generalizations about the relative protectiveness of state and federal
28   law are not particularly helpful.

1    guidance.") See also Vinole v. Countrywide Home Loans, Inc., 246
2    F.R.D. 637 (S.D. Cal. 2007) (noting that federal "outside sales
3    exemption" to wage and hour laws and California "outside salesperson"
4    exemption are similar, except the federal statute does not specify a
5    percentage of time that must be spent outside the office to trigger
6    the exemption.)  Given the lack of California statutory or regulatory
7    definitions, or judicial construction of what it means to "sell"
8    within the terms of the California exemption, reference to comparable
9    federal law is especially sensible here.  Finally, while noting that
10   the Ramirez court identified a difference between federal and state
11   law with regard to quantifying the amount of selling activity required
12   for an employee to be deemed exempt, this Court discerns no difference
13   between federal and state law regarding the qualitative issue of what
14   kind of activity constitutes "selling."  Accordingly, the Court may
15   properly turn to federal law for guidance.
16        In Nielsen v. DeVry, Inc., 302 F. Supp. 2d 747 (W.D. Mich. 2003)
17   the court identified various factors probative of an employee's status
18   as an outside salesperson.  The indicia, from an array of federal
19   courts, include the following: (1) "[T]he job was advertised as a
20   sales position and the employee was recruited based on sales
21   experience and abilities"; (2) "Specialized sales training"; (3)
22   "Compensation based wholly or in significant part on commissions";
23   (4) "Independently soliciting new business"; (5) "[R]eceiving little
24   or no direct or constant supervision in carrying out daily work
25   tasks."  Nielsen, 302 F. Supp. 2d at 756-58 (W.D. Mich. 2003).
26   Various federal and state courts have used one or more of these
27   indicia in applying the outside salesperson exemption.  See Barnick,
28   522 F. Supp. 2d at 1262 (listing cases).

1    Not surprisingly, these factors are consistent with the policy

2  rationale behind the outside salesperson exemption.  The California

3  Division of Labor Standards Enforcement ("DLSE") explained that

4  outside salespersons generally "set their own time, and they're on the

5  road, they call on their customers . . . Rarely [does the employer]

6  know what they're doing on an hour-to-hour basis . . . Hence it is

7  very difficult to control their hours and working conditions."  DLSE

8  Op. Ltr., 9/8/1998 (cited in <u>Barnick</u>, 522 F. Supp. 2d at 1261-1261),

9  available at: <http://www.dir.ca.gov/dlse/OpinionLetters-byDate.htm>.

10  Similar policy concerns motivate the federal exemption for outside

11  salespersons.  <u>See</u> <u>Jewel Tea Co. v. Williams</u>, 118 F.2d 202, 207-208

12  (10th Cir. 1941) (discussing policy rationale).

13    As applied to this case, these factors clearly indicate that

14  Plaintiff was an outside salesperson.  Plaintiff applied for a job in

15  sales, cited his experience as an outside salesperson as a

16  qualification for the job for which he applied, and was hired in a

17  sales capacity.  Plaintiff's job performance was evaluated based upon

18  his ability to achieve "positive change [] in market share," that is,

19  to increase sales of Defendant's products in the territory to which he

20  was assigned.[4]  During Plaintiff's employment, he was given

21  _____

22    [4] In response to several undisputed facts asserting that
   Plaintiff's work evaluation and incentive compensation depended in
23  part upon increased sales in his geographic area, Plaintiff argues
   that many factors other than PSS visits to doctors contribute to
24  changes in market share, including television advertising, newspaper
   advertising, etc.  (<u>See</u> Pl.'s Response UF 52.)  However, that other
25  factors may influence Defendant's market share does not detract from
   the fact that a PSS's job is to increase market share, that is, to
26  generate sales, and that Defendant sought to reward PSSs like
   Plaintiff based upon some estimate of their impact on the market.
27  Stated differently, that it is impossible to precisely quantify the
   extent to which PSSs should be credited with changes in market share
28  relative to other factors does not change the fact that Defendant and

13

1  substantial training in what he and Defendant characterized as sales

2  and selling techniques, including, for example, the "Interactive

3  Solution Selling" model. In addition, as part of his own detailing

4  strategy, Plaintiff asked physicians to prescribe more of the product

5  he was detailing; such requests, under both Plaintiff's and

6  Defendant's view, and this Court's understanding of the term,

7  constitute getting a "close." This is quintessentially "selling"

8  conduct directed at physicians as customers.

9      Although Plaintiff did not earn commissions, he was eligible to

10 earn incentive awards based on market share and/or new prescriptions

11 within his assigned geographical territory. Thus, his compensation

12 was tied, to some extent, on increased sales in his territory. In

13 addition, even though many aspects of Plaintiff's interactions with

14 physicians were governed by Defendant's apparently strict guidelines,

15 Plaintiff was subject to very little direct supervision (once a month

16 or three times a year, depending on the manager) in his day-to-day

17 work.

18      Based on these features of Plaintiff's job, all of the indicia

19 (except for independently soliciting new business[5]) lead to the

20 conclusion that Plaintiff was an outside salesperson: Plaintiff was

21

22 Plaintiff recognized that the quality of Plaintiff's work was sales
work and that Defendant attempted to compensate him accordingly.

23

24     [5] Defendant contends that Plaintiff's job duties also
demonstrate that he independently solicited new business. Although

25 Plaintiff was expected to help achieve prescription growth in his
sales territory, it is not clear that this constitutes "soliciting new

26 business." For example, it is not clear that he was responsible for
identifying new doctors to visit. As such, the Court cannot conclude

27 that the undisputed facts establish that he independently solicited
new business. However, each of the remaining indicia strongly support

28 Defendant's position.

14

1  hired, promoted, and trained in sales; through his one-on-one
2  interactions with his physician customers, Plaintiff attempted to
3  "close" them by getting them to commit to writing more prescriptions;
4  Plaintiff earned incentive compensation based upon actual increases in
5  market share in his geographic area; and, except for a handful of days
6  during the year, Plaintiff was unsupervised in his day-to-day work.
7  Furthermore, concluding that Plaintiff was an outside salesperson is
8  wholly consistent with the policy rationale set forth above.  Indeed,
9  other than asserting the generalization that California law is more
10 protective of overtime rights than federal law is, Plaintiff has
11 identified no way in which deeming him an outside salesperson would
12 thwart state policy.
13      Plaintiff's various arguments seeking to avoid this conclusion
14 are unpersuasive.  Plaintiff's primary contention is that because he
15 himself did not consummate sales, it cannot be said that he "sells."
16 Rather, he contends, the Customer Services and Relations Group is
17 Defendant's sales force.  However, the testimony cited in the Reply,
18 9:16-10:1, makes clear that employees in that group do not solicit
19 sales or orders from wholesalers; instead, they merely "manage orders
20 that [Defendant] receives" (Opp'n 4:16-19) electronically from
21 wholesalers.  Thus, the content of their work demonstrates what the
22 title of their group suggests: Defendant's "Customer Services and
23 Relations" employees are not salespersons.
24      Furthermore, just because Plaintiff and his physician customers
25 did not literally exchange products for consideration does not mean
26 that Plaintiff was not selling the products to the physicians.  In the
27 highly regulated field of prescription pharmaceuticals, it is
28 physicians who control patients' ultimate access to, and purchase of,

1  pharmaceuticals by writing prescriptions - the very behavior to which
2  Plaintiff sought "to induce" physicians to commit.  See Webster's 3rd
3  New World Int'l Dictionary (defining "sell" to include "influenc[ing]
4  or induc[ing] to make a purchase").  Patients can buy only those
5  prescription pharmaceuticals that their physicians permit and direct
6  them to buy.  As such, physicians are the gatekeepers between
7  consumers and pharmaceuticals, and physicians are appropriately the
8  targets of Defendant's sales efforts, as Plaintiff recognized during
9  his employment.  Indeed, as discussed above, Plaintiff's interactions
10  with physicians constitute fundamentally "selling" behavior, and
11  Plaintiff received compensation based on his success in persuading
12  physicians to direct their patients to purchase Defendant's products.
13  Cf. Medtronic, Inc. v. Benda, 689 F.2d 645, 648 (7th Cir. 1982)
14  (stating "physicians were the 'real' purchasers of the pacemakers even
15  though the formal sale was made, in most cases, to the hospital.  The
16  district court correctly focused upon the substance of the sales
17  transactions and not their form.")
18       In an analogous setting, the Department of Labor's Comments to
19  its regulations implementing the FLSA reinforce that "selling" need
20  not involve the literal execution of contracts.  The Department noted
21  employer concerns that employees who "no longer execute contracts or
22  write orders due to technological advances in the retail business"
23  might lose their exempt status and gain overtime protection.  Comment,
24  69 Fed. Reg. 22122-01, at 22162, Section 541.503 Promotion Work.  The
25  Department explained that there should be no change of status for such
26  employees, stating that technological changes in which orders are
27  taken and processed "should not preclude the exemption for employees
28  who in some sense make the sales."  Comment, 69 Fed. Reg. 22122-01, at

16

1  22162 (emphasis added). The Department emphasized that "[e]mployees
2  have a primary duty of making sales if they 'obtain a commitment to
3  buy' from the customer and are credited with the sale. See 1949 Weiss
4  Report at 83 ('In borderline cases the test is whether the person is
5  actually engaged in activities *directed toward* the consummation of his
6  own sales, *at least to the extent of obtaining a commitment* to buy
7  from the person to whom he is selling. If his efforts are directed
8  toward stimulating the sales of his company generally rather than the
9  consummation of his own specific sales his activities are not
10 exempt')." Id. at 22162-22163 (emphasis added).

11      This guidance reinforces the Court's reasoning that the
12 fundamental sales nature of Plaintiff's employment is not diminished
13 by the fact that Plaintiff never literally exchanged pharmaceuticals
14 for consideration. To the contrary, Plaintiff "sold" products to
15 physicians by inducing them to write prescriptions; obtained orders
16 (prescriptions) from customers (physicians) by getting them to
17 prescribe products to their patients; and obtained commitments from
18 those physician/customers to prescribe those products. Each of these
19 characterizations of Plaintiff's work qualifies his work as selling.
20 Furthermore, even though Plaintiff never consummated sales himself,
21 such sales were nevertheless considered "his own" in that sales were
22 tracked within his geographical area and Plaintiff received incentive
23 awards based in part on changes in market share in his area.
24 Accordingly, Plaintiff "engaged in activities directed toward the
25 consummation of his own sales, at least to the extent of obtaining a
26 commitment to buy from the person to whom he is selling." That these
27 sales are consummated indirectly does not take away from the inherent
28 sales quality of Plaintiff's work.

1    Relatedly, Plaintiff urges that his work is properly viewed as
2  promotion work rather than sales work. In support of this
3  "promotion/sales" distinction, Plaintiff cites to the federal
4  regulations. However, it is clear from the regulations and the cases
5  cited therein that "promotion" refers to tasks such as setting up
6  product displays or stocking store shelves. See 29 C.F.R. 541.503(b)
7  and (c) (characterizing "putting up displays and posters, removing
8  damaged or spoiled stock from the merchant's shelves or rearranging
9  merchandise" and "replenish[ing] stock by replacing old with new
10  merchandise . . . consult[ing] with the store manager" as examples of
11  promotional activities); see also Comment, 69 Fed. Reg. 22122-01,
12  Section 541.503 Promotion Work. Under the regulations Plaintiff
13  himself invokes, the work he performed is obviously not promotional
14  work. Furthermore, the Court agrees with the distinction between
15  sales and promotion articulated in Barnick: "The distinction between
16  sales and promotion is more logically made dependent on whether an
17  employee's efforts are directed at persuading particular individuals
18  to purchase a product rather than the general public and whether an
19  employee is compensated based on the employee's success in securing
20  purchases from individuals." Barnick, 522 F. Supp. 2d at 1265. Under
21  this conception, Plaintiff's work was directed at individual
22  physicians with the sole purpose of inducing them to prescribe
23  Defendant's pharmaceutical products to patients who would then
24  purchase those products from pharmacies; Plaintiff received
25  compensation based on his success in so persuading those individual
26  physicians (or a discrete group of individual physicians in his
27  territory). Plaintiff's efforts were not directed at the public at
28  large. As such, the Court rejects Plaintiff's argument that he was

1  engaged in "promotions" rather than "sales."

2      Accordingly, the Court finds that there are no genuine issues of

3  material fact and concludes as a matter of law that Defendant properly

4  classified Plaintiff as an "outside salesperson" under Cal. Labor Code

5  Section 1171, and that Plaintiff was therefore exempt from the

6  overtime requirements of Section 510.[6]  Defendant's Motion is

7  therefore **GRANTED** as to Plaintiff's Second Claim for Relief.

8      As Defendant argues, and as Plaintiff concedes, in light of the

9  Court's determination that Plaintiff was properly classified as exempt

10  as an "outside salesperson" under Section 1171, Defendant is also

11  entitled to judgment as a matter of law on Plaintiff's remaining

12  claims.  Accordingly, Defendant's Motion is **GRANTED** as to Plaintiff's

13  Third through Ninth Claims for Relief.

## V.    CONCLUSION

15      For the foregoing reasons, Defendant's Motion for Summary

16  Judgment is **GRANTED.**

17      In light of the foregoing, Plaintiff's Motion for Class

18  Certification is **STRICKEN AS MOOT.**

19

20      **SO ORDERED.**

21  **DATED:** _____June 11, 2008_____

22

23      _____
    **AUDREY B. COLLINS**
    **UNITED STATES DISTRICT JUDGE**

24

25

26  _____

27      [6]  Because the Court finds that Plaintiff was exempt as an
   outside salesperson, it need not address the alternative ground for
28  the Motion, that Plaintiff falls under the administrative exemption.

19